1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  NICO CRUZ SANCHEZ, individually and on behalf of other members of the general public similarly situated, | )  Case No.: 1:20-cv-1510 JLT EPG |
| 12 | )  ORDER GRANTING PLAINTIFF'S MOTION |
| 13                    Plaintiff, | )  FOR FINAL APPROVAL OF THE CLASS<br>)  ACTION AND PAGA SETTLEMENT |
| 14          v. | )  (Doc. 82.) |
| 15  MOHAWK INDUSTRIES, INC.; DALTILE<br>SERVICE, INC.; DAL-TILE SERVICES, INC.;<br>DAL-TILE CORPORATION, | )<br>)<br>) |
| 16 | ) |
| 17                    Defendants. | )<br>) |
| 18 | ) |

19        Nico Cruz Sanchez asserts the defendants—including Mohawk Industries, Inc.; Dal-tile

20  Service, Inc.; Daltile Service, and Inc.; Dal-tile Corporation— failed to comply with California's wage

21  and hour laws.  (*See generally* Doc. 69.)  Plaintiff seeks final approval of a class settlement reached in

22  this action.  In addition, Plaintiff seeks attorneys' fees and costs from the settlement fund, cots for

23  settlement administration, and a service payment to the class representative.  (Doc. 82.)  Defendants do

24  not oppose the request, and no class members submitted objections to the settlement terms.  The Court

25  found the matter suitable for decision without oral arguments pursuant to Local Rule 230(g) and

26  vacated the final approval and fairness hearing.

27        Because Plaintiff carries his burden to demonstrate certification of the Settlement Class is

28  appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

1

1    fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  The

2    request for attorneys' fees is granted in the modified amount of **$475,000.00**; litigation expenses are

3    awarded in the amount of **$20,897.01**; settlement administration costs are awarded in the amount of

4    $**8,837.00**; and Plaintiff's service payment as the class representative is granted in the modified

5    amount of $**5,000.00**.

6                                            **BACKGROUND**

7            Nico Cruz Sanchez was employed as a warehouse associate from approximately September

8    2016 to December 2018.  (Doc. 70-2 at 11, ¶ 2.4.)  He alleges that "Defendants, jointly and severally,

9    employed [him] as an hourly-paid, non-exempt employee."  (Doc. 69 at 12, ¶ 28.)  He contends,

10   "Defendants engaged in a pattern and practice of wage abuse against their hourly-paid or non-exempt

11   employees within the State of California."  (*Id.* at 13, ¶ 35.)

12   **I.      Plaintiff's Allegations**

13           Plaintiff asserts he worked more than eight hours in a day and "in excess of forty … hours in a

14   week performing work duties off-the-clock."  (Doc. 69 at 20, ¶ 64.)  He contends that he, and other

15   employees, were required "to wait in line to clock in."  (*Id.*)  Plaintiff alleges, "Defendants had a policy

16   and practice of turning off the computers and requiring Plaintiff and other class members to start-up …

17   the computers and wait several minutes prior to being able to clock in."  (*Id.*, ¶ 65.)  He asserts they

18   waited "several minutes to clock-in and clock-out due to the limited amount of available and operating

19   machines and the line that would form due to other employees waiting to clock-in or clock-out at the

20   same time."  (*Id.* at 20-21, ¶ 65.)

21           Plaintiff alleges Defendants also violated California law by failing to provide proper meal and

22   rest breaks.  (Doc. 69 at 22-26, ¶¶ 73-80, 86-92.)  He asserts Defendants required him to work for

23   more than five hours "without an uninterrupted meal period of not less than thirty minutes… and/or

24   rest period."  (*Id.*, ¶ 74.)  Plaintiff contends, "meal periods were often missed, shortened, late, and/or

25   were interrupted because Defendants required them continue to work on orders if it was too busy."

26   (*Id.*, ¶ 75.)  He also asserts, "Defendants interrupted Plaintiff and the other class members during

27   purported meal periods with business-related inquiries, instructions for tasks, and/or to require them to

28   return to work before a full thirty … minutes elapsed to complete or begin tasks."  (*Id.*, ¶ 76.)

Similarly, Plaintiff contends the "rest periods were missed, shortened, late, and/or were interrupted because Defendants required them to continue to work and did not provide actual rest breaks that were uninterrupted and off duty, noting that the employees will stop every now and then and talk." (*Id.* at 25, ¶ 88.)  Plaintiff reports he "did not take any uninterrupted rest period of no less than ten… minutes while working for Defendants." (*Id.*)  Plaintiff alleges Defendants did not pay the premiums required under California law for the failure to provide compliant rest and meal breaks.  (*Id.* at 9, ¶ 19.)

According to Plaintiff, "Defendants failed to pay minimum wage" because the work required during the interrupted breaks and off-the-clock was unpaid.  (Doc. 69 at 27, ¶ 96.)  He contends that he and the similarly situated employees "are entitled to recover the unpaid balance of their minimum wage compensation as well as interest…." (*Id.* at 28, ¶ 97.)

Plaintiff alleges Defendants failed to timely pay him all wages due during the course of his employment.  (Doc. 69 at 30-31, ¶¶ 108-111.)  He contends Defendants also failed to reimburse him "for all necessary business-related expenses and costs" during his employment, such as the use of his "personal phone for business-related purposes." (*Id.* at 36, ¶¶ 130-131.)  In addition, Plaintiff asserts that after his termination, Defendants failed to pay all "wages, earned and unpaid, immediately at the time of [his] discharge." (*Id.* at 29, ¶ 102.)  He contends Defendants also failed to timely pay all wages due to individuals "who quit their employment." (*Id.*, ¶ 103.)

Further, Plaintiff asserts that Defendants "intentionally and willfully failed to provide [him] and the other class members with complete and accurate wage statements," as a result of the alleged violations of California labor law.  (Doc. 69 at 32, ¶ 115.)  He alleges, "Defendants had the information necessary to provide [accurate] wage statements … yet failed to do so on a systematic basis and instead provided wage statements that did not reflect the time worked off the clock or any meal and rest period premiums earned." (*Id.* at 32-33, ¶ 115.)  Plaintiff contends the wage statements did not "accurately reflect[] the total number of hours actually worked and the actual gross and net wages that were earned." (*Id.* at 33, ¶ 115.)

Plaintiff reports that he "requested copies of his employment records, including, but not limited to, his payroll records" on May 15, 2019.  (Doc. 69 at 25, ¶ 123.)  He asserts, "Defendants did not produce all employment records required pursuant to California Labor Code sections 432, 226, and

1  1198.5." (*Id.*, ¶ 124.)  Plaintiff alleges, "upon information and belief, Defendants have failed to keep
2  … accurate and complete payroll records, among other things."  (*Id.*)

3  **II.    Litigation History**

4  On September 14, 2020, Plaintiff initiated this action by filing a complaint on behalf of himself
5  and others similarly situated in Fresno County Superior Court, Case No. 20CECG02675.  (Doc. 1-2.)
6  Defendants filed a notice of removal, invoking this Court's jurisdiction under the Class Action
7  Fairness Act.  (Doc. 1 at 2.)  The Court denied Plaintiff's motion to remand on January 10, 2022.
8  (Docs. 7, 18.)  The Court then issued a scheduling order, opening class discovery and setting a briefing
9  schedule regarding any motion for class certification.  (Doc. 31.)

10  On August 24, 2022, Plaintiff filed an amended complaint against Defendants raising the
11  following causes of action: (1) unpaid overtime, (2) unpaid meal periods, (3) unpaid rest periods, (4)
12  failure to pay minimum wages, (5) failure to timely pay wages due during employment, (6) failure to
13  timey pay final wages, (7) non-complaint wage statements, (8) failure to keep requisite payroll
14  records, (9) unreimbursed business expenses, and (10) violations of Cal. Bus. & Prof. Code §§ 17200.
15  (*See generally* Doc. 40.)  Plaintiff indicated the claims were brought on his own behalf and all others
16  similarly situated, including: "[a]ll current and former hourly-paid or non-exempt employees who
17  worked for any of the Defendants within the State of California at any time during the period from
18  September 15, 2016 to final judgment and who reside in California."  (*Id.* at 4, ¶¶ 14-15.)

19  The parties engaged in discovery, including both informal information exchanges and
20  propounded formal discovery requests.  (Doc. 70 at 18; Doc. 71 at 11, ¶ 26.)  Plaintiff reports that
21  counsel "reviewed and analyzed thousands of pages of documents and data Defendants produced."
22  (Doc. 70 at 18.)  According to Plaintiff, the discovery included: "employment records; a detailed
23  sampling of Class Members' time and pay data, including… spreadsheets of timecard and wage
24  statement statistics; Defendants' Employee Handbooks, agreements, forms, and policy and procedure
25  documentation."  (*Id.*)  The parties also engaged experts, who performed data analysis.  (Doc. 70 at 24;
26  Doc. 70-1 at 17, ¶ 46.)

27  **A.    Settlement proceedings**
28  The parties participated in a mediation session with David Rotman, Esq., on June 20, 2023.

(Doc. 70-1 at 11, ¶ 27.)  Although the matter did not settle at that time, the parties "continued to discuss potential resolution of this case subsequent to the mediation, including requesting, receiving, and analyzing further data and production." (*Id.* at 11-12, ¶ 29.)  The parties participated in a second mediation with Jeffrey Fuchsman, Esq., on January 12, 2024. (*Id.* at 12, ¶ 29.)  Mr. Fuchsman prepared a Mediator's Proposal, which all parties accepted by January 17, 2024. (*Id.*)  To effectuate terms of the settlement, the parties stipulated that Plaintiff may file a second amended complaint, to add a claim for penalties under California's Private Attorney General Act. (Doc. 67 at 5, § T.)  The parties indicated that, for settlement purposes only, Defendants agreed to "not assert a statute of limitations defense to Plaintiff's PAGA claim." (*Id.*, § U.)  The Court approved the stipulation (Doc. 68), and Plaintiff filed his SAC with the additional PAGA claim on April 15, 2024 (Doc. 69).

The parties executed the written agreement in May 2024. (Doc. 70-2 at 2-32.)  Plaintiff filed an unopposed motion for preliminary approval of the class and PAGA settlement. (Doc. 70.)  The Court granted preliminary approval of the settlement terms on October 23, 2024. (Doc. 73 at 10-34, 42.)  The Court appointed Nico Cruz Sanchez as Class Representative and authorized his request for an incentive payment "up to the amount of $10,000, subject to a petition and review" when seeking final approval. (*Id.* at 42; *see also id.* at 30-31.)  The Court appointed Arby Aiwazian, Joanna Ghosh, Brian St. John, and LippSmith LLP as Class Counsel, who were authorized seek fees up to $665,000—which is 35% of the settlement fund—and litigation expenses up to $23,000, also subject to review at the final approval stage. (*Id.* at 23, 42.)  Simpluris, Inc., was appointed the Settlement Administrator and authorized to seek up to $9,000 for administrative costs. (*Id.* at 34-35, 42-43.)  Finally, the Court also preliminarily approved the PAGA settlement and anticipated payments to the LWDA and aggrieved employees. (*Id.* at 32-34, 42.)

On October 31, 2024, the Court approved the "Notice of Class Action Settlement." (Doc. 75; *see also* Doc. 74-1.)  The Class Notice informed the Class Members of the nature of the action, the class definition preliminarily approved by the Court, the issues to be resolved, claims released by participating class members, representation by counsel, deadlines for exclusion and objections, and the binding effect of judgment. (*See* Doc. 74-1; *see also* Doc. 75.)

///

1        **B.      Service of the Class Notice and responses received**

2              Mary Butler, a project manager for the Settlement Administrator, reports Defendants originally

3    provided data that included 549 individuals as Class Members, of which there were also 451 PAGA

4    Aggrieved Employees. (Doc. 82-4 at 4, Butler Decl. ¶¶ 6, 8.)  On November 15, 2024, the Settlement

5    Administrator mailed the Notice to the Class Members and Aggrieved Employees, with addresses

6    provided either by Defendant or the National Change of Address Database.  (*Id.*, ¶¶ 7-8.)  Ms. Butler

7    reports that if the Postal Service returned a Class Member's Notice as undeliverable and without the

8    forwarding address, then "Simpluris performed an advanced address search (i.e. skip trace) on all of

9    these addresses by using Accurint, a reputable research tool owned by Lexis-Nexis."  (*Id.* at 4, ¶ 9.)

10   According to Ms. Butler, Simpluris located updated addresses for 28 individuals and re-mailed the

11   Class Notice.  (*Id.*)  The Class Notice remained undeliverable for 7 individuals.  (*Id.*)

12             On January 24, 2025, Defendants notified the Settlement Administrator that after Simpluris

13   mailed the Class Notices, two individuals were inadvertently omitted from the class list previously

14   provided ("the Omitted Class Members").  (Doc. 82-4 at 4, ¶ 8.)  Upon learning this information, "the

15   Settlement Administrator determined that it would cost an additional $6,745.14 to fund the amounts

16   due to the Omitted Class Members, using the same formulas used to calculate payments in the Notice

17   provided to [other] Class Members."  (Doc. 76 at 4-5, ¶ N.)  The Settlement Administrator also

18   informed the parties that "additional costs associated administering the Settlement with respect to the

19   Omitted Class Members[] will not exceed the amount allocated in the Preliminary Approval Order."

20   (*Id.* at 5, ¶ N.)  In addition, Defendants "agreed to pay an additional $6,745.14, plus Defendants' share

21   of any employer payroll taxes attributed to payment to the Omitted Class Members."  (*Id.*, ¶ O.)

22   Pursuant to the stipulation, "Defendants will fund the $6,745.14 in Settlement payments for the

23   Omitted Class Members separately and in addition to the Maximum Settlement Amount, and this

24   amount will be included in the final Net Settlement Amount that will be distributed to Class Members

25   who do not opt out of the Settlement (i.e., Settlement Class Members), and the PAGA Aggrieved

26   Employees."  (*Id.* at 6.)

27             The Court approved the stipulation of the parties in part and ordered "[t]he two Omitted Class

28   Members shall be included in the Settlement."  (Doc. 77 at 2, emphasis omitted.)  To allow the time

contemplated under the Settlement for the Omitted Class Members to respond to the Notice—including making any objections or request to opt out of the class—the Court continued the final approval and fairness hearing date.  (*Id.* at 2.)  The Court ordered the parties to revise the previously approved Notice to include updated response deadlines for the Omitted Class members and directed the Settlement Administrator to mail the Notice to the Omitted Class Members no later than February 18, 2025.  (*Id.*)  Ms. Butler filed a supplemental declaration, reporting that Simpluris provided the notice as ordered, and neither Notice was returned as undeliverable.  (Doc. 86 at 3, Butler Supp. Decl. ¶ 7.)

The Settlement Administrator did not receive any requests from exclusion, from either the Notice mailing or the subsequent Notice to Omitted Class Members.  (Doc. 82-4 at 6, ¶ 3; Doc. 8 at 3, ¶ 9.)  No one disputed the number of workweeks identified in the Notice for purposes of calculating the settlement shares of the participating class members and aggrieved employees.  (Doc. 86 at 3, ¶ 11; *see also* Doc. 82-4 at 5, ¶ 16.)  Finally, neither the Settlement Administrator nor the Court received objections to the Settlement.  (Doc. 86 at 3, ¶ 10; *see also* Doc. 82-4 at 6, ¶ 15.)

### C.    Pending final approval

Plaintiff now seeks final approval of the Settlement, including: (1) attorneys' fees and costs for Class Counsel, (2) a service award for Plaintiff as the Class Representative, (3) and costs of settlement administration.  (Doc. 82.)  Defendants filed a statement indicating they "have no opposition" to the motion for final approval of the class action and PAGA settlement.  (Doc. 84.)

### SETTLEMENT TERMS

Pursuant to the "Joint Stipulation of Class Action and PAGA Settlement" ("the Settlement"), the parties agree to a gross settlement amount of $1,906,745.14[1] for the class defined as: "all current and former hourly-paid or non-exempt employees who worked for any of the Defendants within the State of California at any time during the period from September 15, 2016, through April 11, 2024, … and who reside in California."[2]  (Doc. 70-2 at 2, ¶ 1.3; *id.* at 7, ¶ 1.18.)  In addition, the Settlement

---

[1] The original settlement was for $1,900,000.00.  However, as discussed above, Defendants agreed to fund an additional $6,745.14 upon discovery of two Omitted Class Members.  (Doc. 76 at 5.)  Thus, the gross settlement now totals $1,906,745.14. (Doc. 82-4 at 5, ¶ 18; *see also* Doc. 83 at 2, St. John. Supp. Decl. ¶ 3.)

[2] The Class Period is defined as "September 15, 2016 through April 11, 2024, or through the Preliminary Approval Date (whichever is earlier)."  (Doc. 70-2 at 4, ¶ 1.6.)  Accordingly, the Court adopts the earlier date.

7

1   includes an "escalator clause," under which the gross settlement amount may be increased if the actual

2   number of workweeks for all class members increases by more than 10% over the estimated 86,162

3   workweeks included in the Class Period.[3]  (*Id.* at 3, ¶ 1.3.)  Defendants agreed to deliver the gross

4   settlement amount to an escrow account of the proposed administrator within ten days of executing the

5   Settlement.  (*Id.* at 24, ¶ 4.11.1.)

6   **I.      Payment Terms**

7            The gross settlement fund will cover payments to class members, with additional compensation

8   to Plaintiff as the class representative.  (Doc. 70-2 at 7, ¶ 1.18.)  In addition, the Settlement provides for

9   payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the

10  California Labor & Workforce Development Agency.  (*Id.*; *see also id.* at 9, ¶ 1.31.)  Specifically, the

11  Settlement provides for the following payments from the gross settlement amount:

12           • The Class Representative will receive a service payment up to $10,000;

13           • Class counsel will receive up to $665,000.00 for attorneys' fees and
             litigation expenses up to $23,000;

14

15           • The California Labor and Workforce Development Agency shall receive
             $75,000 from the total PAGA payment of $100,000, with the remainder
             distributed to aggrieved employees; and

16

17           • The Settlement Administrator will receive up to $9,000 for fees and
             expenses.

18  (*Id.* at 7, ¶ 1.18; *id.* at 9, ¶ 1.31.)  After these payments, the remaining money ("Net Settlement

19  Amount") will be distributed to class members.  (*Id.* at 7, ¶ 1.18.)  With the identified payments from

20  the gross fund, the Settlement Administrator reports the anticipated Net Settlement Amount is

21  $1,099,808.14, including the additional funds for the Omitted Class Members.  (Doc. 82-4 at 5, Butler

22  Decl. ¶ 18.)  The parties agreed that the fund is "non-reversionary," and "under no circumstances will

23  there be any reversion to Defendants of any funds" from the "Maximum Settlement Amount" or gross

24  settlement.  (Doc. 70-2 at 25, ¶ 4.11.12.)

25           Class members are not required to submit a claim to receive a share from the Net Settlement

26  Amount.  (Doc. 70-2 at 16, ¶ 4.2.1; *see also id.* at 46-47.)  Class members' shares will be distributed

27

28  ───────────────
    [3] This Settlement Administrator now reports the escalator clause was not triggered.  (Doc. 82-4 at 4, ¶ 10.)

on a *pro rata* basis, based upon their number of workweeks during the relevant period. (*Id.*, ¶ 4.2.2.)

The Settlement provides:

> Each Class Member's Individual Payment Amount shall be calculated by (i) dividing the Settlement Class Member's total number of workweeks worked for Defendants in California during the Class Period by the total number of workweeks worked by all Settlement Class Members for Defendants during the Class Period, and (ii) multiplying that pro rata share by the allocated amount of the Net Settlement Amount. Any workweeks during the Class Period in which a Settlement Class Member did not actually work (for example, while on a leave of absence, etc.) are not included in calculating that Settlement Class Member's Individual Payment Amount. The calculation of a Settlement Class Member's total workweeks worked in California shall be construed from Defendants' records. Each Settlement Class Member's Individual Payment Amount shall be distributed to that Settlement Class Member, less applicable withholdings attributed to the portion of Individual Payment Amounts designated as wages.

> Of the PAGA Penalty Payment of $100,000.00, 25%, or $25,000.00, will be distributed among the PAGA Aggrieved Employees, even if the employee opts out of the class settlement. The PAGA Aggrieved Employees' share of the $25,000.00 of the PAGA Penalty Payment shall be calculated by (i) dividing the aggrieved employee's total number of workweeks worked for Defendants in California during the PAGA Period by the total number of workweeks worked by all aggrieved employees for Defendants during the PAGA Period, and (ii) multiplying that pro rata share by the allocated amount of the $25,000.00. Any workweeks during the PAGA Period in which an aggrieved employee did not actually work (for example, while on a leave of absence, etc.) are not included in calculating that aggrieved employee's PAGA payment. The calculation of an aggrieved employee's total workweeks worked in California shall be construed from Defendants' records.

(*Id.*) Thus, the exact amount settlement class members receives depends upon how many weeks they worked for Defendants, and whether they are entitled to a portion allocated for the release of PAGA claims. With a class of 551 individuals, the Settlement Administrator reports that the average share of the Net Settlement Amount is approximately $1,996.20, the highest anticipated payment is $5,621.05, and the lowest payment expected is $14.19. (Doc. 82-4 at 5, Butler Decl. ¶ 19.) Defendants also agreed to separately pay the employer-side taxes for these payments made to Class Members. (Doc. 70-2, ¶¶ 1.18, 4.3.1; *see also* Doc. 76 at 5, ¶ O.)

The Settlement Administrator will distribute the payments by mailing checks to all participating class members and aggrieved employees. (Doc. 70-2 at 25, ¶ 4.11.3.) Checks must be cashed within 90 days of the mailing. (*Id.*, Settlement ¶ 4.11.4.) If any check remains uncashed after

the 90-period, the check will be cancelled and voided.  (*Id.*)  The Settlement Administrator shall redistribute the uncashed funds to those "who cashed their payments from the initial distribution of Settlement Proceeds," with the same *pro rata* calculation methods.  (*Id.*)  If checks from the second distribution are not cashed, the funds will not revert to Defendants.  (*Id.*)  Rather, the Settlement Administrator will cancel and void the uncashed checks, and the money will be distributed to a cy pres beneficiary—who the parties propose shall be Legal Aid at Work—"or shall otherwise be distributed as ordered by the Court."  (*Id.*)

## II.    Releases

The Settlement provides that Plaintiff and class members, other than those who elect not to participate in the Settlement, release Defendants[4] from claims "from September 15, 2016, through the date of preliminary approval."  (Doc. 70-2 at 9, ¶ 1.27.) The "Released Claims" are defined as:

> all claims, demands, rights, liabilities, and causes of action that were pled in any of the complaints in the Action or could have been pled based on the facts alleged in any of the complaints in the Action, based on Defendants' alleged (1) failure to pay all overtime in violation of California Labor Code sections 510, 1194 and 1198 and the applicable IWC Wage Orders; (2) failure to provide proper meal periods, or premium pay for non-compliant meal periods, in violation of California Labor Code sections 226.7 and 512 and the applicable IWC Wage Orders; (3) failure to authorize and permit rest periods, or premium pay for non-compliant rest periods, in violation of California Labor Code section 226.7 and the applicable IWC Wage Orders; (4) failure to pay minimum wages in violation of California Labor Code sections 1194, 1194.2, 1197, and 1197.1 and the applicable IWC Wage Orders; (5) failure to pay all wages on termination of employment in violation of California Labor Code sections 201, 202, and 203; (6) failure to pay timely wages during employment in violation of California Labor Code sections 204; (7) failure to provide accurate wage statements in violation of California Labor Code section 226 and the applicable IWC Wage Orders; (8) failure to maintain requisite payroll records in violation of California Labor Code sections 226, 432, 1174, and 1198.5; (9) unreimbursed business expenses in violation of Labor Code sections 2800 and 2802; (10) all claims for unfair business practices that could have been premised on the facts, claims, causes of action or legal theories described above; and (11) all claims under the PAGA that could have been premised on the facts, claims, causes of action or legal theories described above.

---

[4] The Settlement defines "Releasees" as including "Defendants and their present and former parent companies, subsidiaries, affiliates, and joint ventures, and each of their respective present and former officers, directors, controlling stockholders, agents, affiliates, employees, insurers, co-insurers, reinsurers, attorneys, including legal counsel herein, accountants, auditors, advisors, representatives, consultants, pension and welfare benefit plans, plan fiduciaries, administrators, trustees, general and limited partners, predecessors, successors and assigns, and the spouse of each of the foregoing who is a natural person." (Doc. 70-2 at 9, ¶ 1.28.)

(*Id.* at 8-9, ¶ 1.27.)

For individuals who are "aggrieved employees" under PAGA, the released claims include: "all PAGA claims and claims for PAGA penalties alleged in any iteration of the complaints filed by Plaintiff, and any letter submitted to the LWDA by Plaintiff seeking authorization to pursue PAGA claims which occurred during the PAGA Period." (Doc. 70-2 at 7, ¶ 1.22.) Even if an aggrieved employee opts out of the class settlement, he or she will still be bound by the PAGA Release, which covers the period from September 15, 2019 to the Preliminary Approval date. (*Id.*, ¶¶ 1.21, 1.22.) However, this release "does not cover an aggrieved employee's individual Labor Code claims" and "expressly excludes claims for vested benefits, wrongful termination, unemployment insurance, disability, social security, workers' compensation, and PAGA claims arising after the end of the PAGA Period." (*Id.* at 7-8, ¶ 1.22.)

The release for Plaintiff encompasses more claims than those identified for Settlement Class Members and the PAGA Members, because he agreed to release additional claims that could have arisen during the course of his employment with Defendants, whether known or unknown. (Doc. 70-2 at 4-5, ¶ 1.8.) Plaintiff's release encompasses:

> all claims, obligations, demands, actions, rights, causes of action, and liabilities against the Releasees, based on the facts as set forth in the Second Amended Complaint filed on April 15, 2024, whether in law or equity, whether sounding in tort, contract, federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law, whether known or unknown, and whether anticipated or unanticipated, including unknown claims covered by Civil Code § 1542 (as quoted in Paragraph 4.12.2) by the Class Representative, arising during the period from the beginning of the Class Representative's dates of employment with Defendants to the date on which the Court enters an order granting final approval of this Settlement, for any type of relief, including, without limitation, claims for wages, business expenses, damages, unpaid costs, penalties (including civil and waiting time penalties), liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief with the sole exception of any claims which cannot be released as a matter of law. The Class Representative's Released Claims include, but are not limited to, the Released Claims as well as any other claims under any provision of the Fair Labor Standards Act, any provision of the California Labor Code or any applicable California Industrial Welfare Commission Wage Orders, all claims for statutory penalties that could have been sought by the Labor Commissioner for the violations identified in Plaintiff's pre-filing letter to the LWDA, and claims under state or federal discrimination statutes, including, without limitation, the California Fair Employment and Housing Act, California Government Code § 12940 et seq.; the Unruh Civil Rights Act, California Civil Code § 51 et seq.; the California Constitution; Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000 et seq.; the Americans with Disabilities Act, 42
U.S.C. § 12101 et seq.; California's PAGA (Cal. Labor Code § 2698, et
seq.); Cal. Bus. and Prof. Code § 17200 et seq.; the Employee Retirement
Income Security Act of 1974, 29 U.S.C. § 1001 et seq.; any IWC California
Wage Orders and California Code of Regulations, Title 8, section 11000, et
seq.; and/or any other federal, state or local human rights, civil rights,
wage-hour, pension or labor law, rule, statute, regulation, constitution or
ordinance and/or public policy, contract or tort law, or any claim of
retaliation under such laws, or any claim of breach of any contract (whether
express, oral, written or implied from any source), or any claim of
intentional or negligent infliction of emotional distress, tortious
interference with contractual relations, wrongful or abusive or constructive
discharge, defamation, prima facie tort, fraud, negligence, loss of
consortium, malpractice, breach of duty of care, breach of fiduciary duty;
and all of their implementing regulations and interpretive guidelines.

(Doc. 70-2 at 4-5, ¶ 1.8.)  Thus, claims released by Plaintiff—but not the Settlement Class—include

any claims arising under the Americans with Disabilities Act, Title VII, 42 U.S.C. § 1981, and ERISA.

Indeed, the Settlement indicates Plaintiff makes a general release "to the fullest extent permitted by

law, the provisions, rights, and benefits he may otherwise have had pursuant to California Civil Code

section 1542." (*Id.* at 26, ¶ 4.12.2.)  Plaintiff acknowledged that the waiver of the provisions of Section

1542 was "an essential and material term" of the Settlement, which "would not have been entered

without such a waiver from Plaintiff." (*Id.*, ¶ 4.12.3.)

### III.    Objections and Opt-Out Procedures

Class members are not required to take any action to receive a settlement payment.  (Doc. 82-4

at 9 [notice originally mailed to Class Members]; Doc. 86 at 7 [notice to the Omitted Class Members].)

However, any class member who wished had the opportunity to submit objections to the Settlement

terms or request exclusion from the Settlement.  (Doc. 70-2 at 20-22, ¶¶ 4.6.3- 4.6.10; *see also* Doc.

82-4 at 10-11; Doc. 86 at 7-8.)

Individuals who wished to be excluded from the Settlement Class were required to submit a

"Request for Exclusion" that included their "full name, address, and telephone number, the name and

case number of the Action, and shall be signed by the Class Member." (Doc. 70-2 at 20, ¶ 4.6.3.)  The

Notice informed individuals: "If you exclude yourself from the settlement, you will not be entitled to

recover any settlement payment except your share of the PAGA settlement if you worked during the

PAGA Period. You will also not be allowed to object to the settlement, but you will retain the right to

bring any claims you may have against Defendants." (Doc. 82-4 at 10; Doc. 86 at 8.)  Requests for

1   Exclusion were to be mailed 45 days of the mailing of the Notice to be deemed timely.  (Doc. 70-2 at

2   21, ¶ 4.6.4; *see also id.* at 9, ¶ 1.29.)

3       Class Members could also object to the settlement terms by mailing a written statement to the

4   Settlement Administrator within 45 days of the mailing of the Notice Packet.  (Doc. 70-2 at 22, ¶ 4.6.8;

5   *see also id.* at 9, ¶ 1.29.)  An objection needed to include: (1) the case name and number; (2) the full

6   name of the class member; (3) grounds for objection; (4) "any legal briefs, papers, or memoranda the

7   objecting Class Member proposes to submit to the Court."  (*Id.* at 21, ¶ 4.6.7.)  The Class Notice

8   identified each of these requirements.  (Doc. 82-4 at 10; Doc. 86 at 7.)  Further, class members were

9   informed that they could not both ask to be excluded *and* object to the Settlement terms.  (*Id.*)

10                      **APPROVAL OF THE CLASS SETTLEMENT**

11      When parties settle the action prior to class certification, the Court has an obligation to "peruse

12  the proposed compromise to ratify both the propriety of the certification and the fairness of the

13  settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also* Fed. R. Civ. P. 23(e)

14  ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of

15  settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval").

16  Approval of a class settlement is generally a two-step process.  First, the Court must assess whether a

17  class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court

18  must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.*

19  (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).  The decision to approve or

20  reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

21  **I.    Certification of the Settlement Class[5]**

22      Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

23  provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

24  of all."  Fed. R. Civ. P. 23(a).  Plaintiff seeks certification of Settlement Class defined as: "all current

25  and former hourly-paid or non-exempt employees who worked for any of the Defendants within the

26  State of California at any time during the period from September 15, 2016, through April 11, 2024, and

27

28  _____
[5] Because the Court only provisionally certified the class upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

13

1    who reside in California."  (Doc. 70-2 at 3, ¶ 1.3.)

2       **A.    Rule 23(a) requirements**

3       Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

4    are satisfied, and "must affirmatively demonstrate … compliance with the Rule."  *Wal-Mart Stores,*

5    *Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304,

6    1308 (9th Cir. 1977).  The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly

7    encompassed by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*,

8    457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

9           (1) the class is so numerous that joinder of all members is impracticable;
            (2) there are questions of law or fact common to the class; (3) the claims
10          or defenses of the representative parties are typical of the claims or
            defenses of the class; and (4) the representative parties will fairly and
11          adequately protect the interests of the class.

12   Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality,

13   typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

14          1.    Numerosity

15      This prerequisite requires the Court to consider "specific facts of each case and imposes no

16   absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is

17   not a specific threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant*

18   *Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002)

19   (finding the numerosity requirement … "satisfied solely on the basis of the number of ascertained class

20   members"); *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (a

21   proposed class with 110 members "clearly [included] a sufficient number to meet the numerosity

22   requirements").  The Settlement Administrator reports the Settlement Class includes 551 individuals.

23   (Doc. 82 at 17.)  Therefore, joinder of all identified individuals is impracticable, and the numerosity

24   requirement is satisfied.

25          2.    Commonality

26      Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

27   To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and

28   law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members'

claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks, citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

Plaintiff argues the commonality requirement is satisfied because "class members share common questions of law and fact." (Doc. 70 at 27, emphasis omitted.)  He asserts:

> Defendants' policies and practices concerning overtime and meal break/rest periods implicate the class members' claims as a whole. Based on documents and information obtained through formal and informal discovery and exchange of information for mediation, Plaintiff contends all Class Members were subject to the same or similar job duties and uniform operations and employment practices, policies, and procedures during the Class Period. Plaintiff's claims arise from Defendants' uniform policy and systematic scheme, as to Plaintiff and Class Members, of failing to pay regular, minimum, and overtime wages properly; failing to pay all compensation due for work performed; failing to provide compliant meal and rest periods and associated premium pay; and failing to reimburse Plaintiff and Class Members for necessary business-related expenses.

(Doc. 70 at 27-28, citing St. John Decl. ¶ 27 [Doc. 70-3 at 20]; LippSmith Decl. ¶ 24 [Doc. 70-1 at 10].)  In addition, Plaintiff asserted that Defendant "uniformly failed to pay all Class Members all compensation due to them during the Class Period." (*Id.* at 28.)

Because it appears resolution of the identified issues—including whether Defendants' wages, breaks, and payroll practices and policies violated California law—apply to the claims of each of the class members, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.    Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality ensures "the interest[s] of the named representative align[] with the interests of the class." *Torres v. Mercer Canyons Inc.*, 835

1    F.3d 1125, 1141 (9th Cir. 2016) (citation omitted).  A claim or defense is not required to be identical,

2    but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.

3    "The test of typicality is whether other members have the same or similar injury, whether the action is

4    based on conduct which is not unique to the named plaintiffs, and whether other class members have

5    been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

6    Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d

7    1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same

8    claims as other members of the class and are not subject to unique defenses).

9    Plaintiff asserts that "[h]is claims and defenses are typical of the class."  (Doc. 70 at 29.)  He

10    reports Defendants employed him "as an hourly-paid, non-exempt employee from September 2016 to

11    approximately December 2018."  (Doc. 70-4 at 2, Sanchez Decl. ¶ 2.)  Plaintiff contends his

12    "individual claims align with those of the Class," based upon Defendants' alleged "uniform, unlawful

13    practices and procedures."  (Doc. 70 at 29.)  Thus, even if not a class representative, Plaintiff would be

14    a member of the Settlement Class.  Because Plaintiff was subjected to the same company policies and

15    payment procedures as the class members—and there are no unique defenses asserted by either party

16    at this time—the Court finds the typicality requirement is satisfied for purposes of settlement.[6]  *See*

17    *Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

18    ### 4.    Fair and Adequate Representation

19    Absentee class members must be adequately represented for judgment to be binding upon them.

20    *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  This prerequisite is satisfied if the representative party

21    "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[R]esolution of

22    this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have

23    any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel

24    prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

25    454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

26

27    _____

[6] To the extent Defendants may have raised a defense to Plaintiff's PAGA claim, for settlement purposes only, Defendants agreed to "not assert a statute of limitations defense to Plaintiff's PAGA claim." (Doc. 67 at 5, § U.)

28    Based upon Defendants' stipulation, the Court finds the potential defense to Plaintiff's PAGA claim does not thwart his appointment as a class representative for the Settlement Class.

1        a.    Class representative

2        The Court conditionally appointed Plaintiff as the class representative for the Settlement Class.

3    (Doc. 73 at 42.)  Graham LippSmith reports that Plaintiff "vigorously pursued claims" on behalf of the

4    class.  (Doc. 70-1 at 15-16, ¶ 43.)  Mr. LippSmith asserts: "Plaintiff followed case progress and

5    provided both documents concerning his employment with Defendants and information about non-

6    exempt employees' duties.  Plaintiff reviewed documents and answered all our questions.  Plaintiff also

7    helped develop strategies by pinpointing documents and information to obtain from Defendants,

8    identifying potential witnesses, and describing Defendants' policies, practices, and procedures."  (*Id.*)

9    Likewise, Brian St. John asserts that "Plaintiff has spent a substantial amount of time and effort

10   gathering and producing relevant documents and information, providing the facts and evidence

11   necessary to attempt to prove the allegations, and discussing their employment with counsel."  (Doc.

12   70-3 at 16, St. John Decl. ¶ 14.)  According to Mr. St. John, "Plaintiff was available whenever counsel

13   needed them and actively tried to obtain information that would benefit the prosecution of the case,

14   including … working with Class Counsel to prepare responses to discovery requests that were

15   propounded on him by Defendants."  (*Id.*)

16       The parties did not identify any conflict between Plaintiff and the Settlement Class, and review

17   of the allegations before the Court does not reveal any conflict.  Based upon the information by

18   counsel, Plaintiff endeavored to prosecute the claims on behalf others similarly situated.  Moreover,

19   the interests of Plaintiff are aligned with those of the class members: to maximize the recovery of pay

20   not received due to the alleged violations of California wage and hour laws.  Thus, Plaintiff satisfies

21   the adequacy requirement of Rule 23(a).

22       b.    Class Counsel

23       The Court appointed Arby Aiwazian, Joanna Ghosh, Brian St. John, and LippSmith LLP as

24   Class Counsel when granting provisional certification of the Settlement Class.   Brian St. John and

25   Graham LippSmith provided declarations attesting to the experience of the attorneys seeking

26   appointment as class counsel.  (*See* Docs. 70-1, 70-3.)

27       Mr. St. John, an attorney with "Lawyers *for* Justice," reports the organization "is comprised of

28   attorneys who focus on litigating complex wage-and-hour class and Private Attorneys General Act …

17

representative actions." (Doc. 70-3 at 2, ¶ 2.) Mr. St. John reports he was admitted to practice in 2015 and "worked on many wage and hour class action and PAGA representative matters." (*Id.*, ¶ 5.) This work included "researching and drafting pleadings, administrative notice exhaustion, drafting, negotiating, and finalizing stipulations and settlement agreements, engaging in motion practice, claims evaluation and analysis, and making court appearances." (*Id.*) Arby Aiwazian and Joanna Ghosh were each admitted to admitted to practice law in 2010. (*Id.* at 3, ¶¶ 3-4.) Mr. Aiwazian worked on more than 100 "class action or representative action cases which have resulted in settlement." (*Id.*, ¶ 3.) Ms. Ghosh "also has extensive experience with class action and/or representative action settlements," and "has taken and defended dozens of depositions and successfully handled motion practice in class action cases regarding discovery (including and not limited to, regarding class contact information), class certification (both contested class certification and stipulated class certification), arbitration agreements, coordination, intervention." (*Id.* at 3-4, ¶ 4.)

Mr. LippSmith reports, "LippSmith LLP is a four-attorney law firm with offices in Los Angeles and Honolulu," and the attorneys "have collectively recovered hundreds of millions of dollars in complex cases against the largest companies in the world." (Doc. 70-1 at 2, ¶ 4.) Mr. LippSmith reports that was licensed to practice in 2002, and he has "managed hundreds of cases in the class action, mass tort, consumer, personal injury, business, insurance, intellectual property, and entertainment practice areas." (*Id.* at 3, ¶ 6.) In addition, he reports that MaryBeth LippSmith, co-founder of LippSmith LLP, was also admitted to practice in 2002 and has written "appeals on class action, consumer litigation, mass tort, and serious personal injury matters; assisted trial lawyers with dispositive motions; and consulted private mediators on large, complex, high-profile matters in advance of mediation." (*Id.*, ¶ 9.) According to Mr. LippSmith, the "LippSmith LLP team members have personally served as class counsel, putative class counsel, lead counsel, and committee counsel in more than dozens of class action and mass action lawsuits, representing tens of millions of plaintiffs and class members, collectively." (*Id.* at 4, ¶ 14.)

The described litigation experience supports a conclusion that counsel prosecuted the action vigorously on behalf of the putative class when the action was filed and continued to do so for the Settlement Class. There are not any identified conflicts between the attorneys and the Settlement

Class.  Further, Defendants did not oppose appointment of Class Counsel or otherwise assert the attorneys with LFJ and LippSmith LLP are inadequate to represent the interest of the Settlement Class. Therefore, the Court finds Class Counsel satisfy the adequacy requirement.

**B.     Certification of a class under Rule 23(b)(3)**

For the foregoing reasons, the prerequisites of Rule 23(a) are satisfied by the Settlement Class. However, a class may only be certified if it is also maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  Plaintiff asserts certification of the settlement class is appropriate under Rule 23(b)(3), which requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  These two requirements are generally called the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

### 1.     Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

Plaintiff contends the predominance requirement is satisfied because the class "claims involve the same allegations, fact, supporting evidence, and applicable law."  (Doc. 70 at 28.)  According to Plaintiff, "the outcome of this litigation hinges on Defendant' uniform operations and employment policies and procedures, which applied across its hourly-paid employees during the Class Period."  (*Id.*) For example, Plaintiff asserts Defendants had a "uniform policy and systematic scheme" of "failing to provide compliant meal and rest periods and associated premium pay."  (*Id.*)  In addition, Plaintiff contends Defendants' payroll and recordkeeping practices applied to the entirety of their hourly-paid

workforce.  (*Id.*)  Based upon the information provided and the allegations presented in the Second Amended Complaint, the Court finds adjudication of the claims via a class action promotes judicial economy, and the Settlement Class satisfies this requirement.

2.    Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted). This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the desirability of concentrating claims in one forum, and (4) difficulties with the management of the class action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the factors identified in Rule 23(b)(3) address the "superiority" analysis).

a.    *Class members' interest in individual litigation*

The Court must consider "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant when class members "suffered sizeable damages or [have] an emotional stake in the litigation." *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011).  The Ninth Circuit explained that "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.

The Settlement Administrator reports there were no objections and no requests for exclusion. (Doc. 86 at 3, Butler Supp. Decl. ¶¶ 9-10.)  There is no indication Class Members desire to control this action or proceed with individual litigation.  Indeed, "[t]he absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement."  *Nat'l Rural Telecomms.*, 221 F.R.D. at 529 (citations omitted); *see also Barcia v. Contain-A-Way, Inc.*, 2009 WL 587844 at *4 (S.D. Cal. Mar. 6, 2009).

In addition, the anticipated payments to Class Members are not particularly large, with an average class payment of $1,996.20.  (*See* Doc. 82-4 at 5, Butler Decl. ¶ 19.)  It is unlikely that

individuals would pursue such small claims. *See Zinser*, 253 F.3d at 1190; *see also Millan v. Cascade Water Servs., Inc.,* 310 F.R.D. 593, 606 (E.D. Cal. 2015) (the estimated average of about $7,300 per class member supported a conclusion that a class action was superior to individual litigation, because it was "unlikely that such a sum would drive interest in controlling the prosecution of a separate action"); *Dakota Med., Inc. v. RehabCare Group, Inc.,* 2017 WL 1398816, *10 (E.D. Cal. Apr. 19, 2017) ("an average recovery of slightly less than $2,000[] would be likely far too little to warrant bringing each of these similar claims as individual actions" and supported the conclusion that "a class action … is superior to any other available method for adjudicating this controversy"). As this Court previously observed, "When the individual claims of class members are small, the class action facilitates the spreading of the litigation costs among the numerous injured parties." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, (E.D. Cal. 2013) (internal quotation marks, citation omitted). Thus, the factor weighs significantly in favor of certification for the Settlement Class.

### b.    Other litigation

Next, the Court considers "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). The parties did not identify any other litigation encompassing the claims addressed raised by Plaintiff in this action. Therefore, this factor weighs in favor of certification and final approval.

### c.    Concentration in one forum

Third, the Court must consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). There is no suggestion the Eastern District is an undesirable forum for the matter, which raises wage and hour claims on behalf of individuals who worked throughout the state. *See United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of certification where the proposed class was compromised of individuals located in California and involved "California state law claims"). Moreover, as this Court previously explained, when "parties … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one forum is obvious." *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation marks, citation omitted). Consequently, this factor weighs in favor of certification.

1

#### d. Management of the action

2   Finally, the Court must consider "the likely difficulties in managing a class action." Fed. R.

3 Civ. P. 23(b)(3)(D). The Supreme Court explained that, in general, "manageability … encompasses the

4 whole range of practical problems that may render the class format inappropriate for a particular suit."

5 *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Because the parties reached an agreement for

6 the class claims and identified the Settlement Class, it does not appear there are any problems with

7 managing the action. *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019) ("manageability is

8 not a concern in certifying a settlement class where, by definition, there will be no trial"); *see also*

9 *Spann v. J.C. Penney Corp.*, 214 F.R.D. 312, 318 (C.D. Cal. 2016) ("settlement obviates the need for a

10 manageable trial"). Further, the Court need not speculate as to manageability of the classes if the case

11 were to proceed to trial. *See Amchem Prods.*, 521 U.S. at 620 ("with a request for settlement-only class

12 certification, a district court need not inquire whether the case, if tried, would present intractable

13 management problems"). Thus, this factor weighs in favor of certification of the Settlement Class.

14  **C. Conclusion and certification**

15   Plaintiff carries the burden to show the prerequisites of Rule 23(a) are satisfied, and the class is

16 maintainable under Rule 23(b)(3). Accordingly, the request to certify the Settlement Class defined

17 above is **GRANTED**.

18 **II. Evaluation of the Settlement Terms**

19   Settlement of a class action requires approval of the Court, which may be granted "only after a

20 hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

21 Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the

22 class. *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985). The Ninth Circuit identified

23 several factors to evaluate whether a settlement agreement meets these standards, including:

24     the strength of plaintiff's case; the risk, expense, complexity, and likely
      duration of further litigation; the risk of maintaining class action status

25     throughout the trial; the amount offered in settlement; the extent of
      discovery completed, and the stage of the proceedings; the experience

26     and views of counsel; the presence of a governmental participant; and
      the reaction of the class members to the proposed settlement.

27

28 *Staton*, 327 F.3d at 959 (citation omitted).

The Federal Rules now also identify "specific factors to consider in determining whether a settlement is 'fair, reasonable, and adequate.'" *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021). In relevant part, Rule 23(e) directs the Court to consider whether:

> (A)  the class representatives and class counsel have adequately represented the class;
> (B)  the proposal was negotiated at arm's length;
> (C)  the relief provided for the class is adequate, taking into account:
>      (i) the costs, risks, and delay of trial and appeal;
>      (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>      (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>      (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D)  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24. "The goal of amended Rule 23(e) is to focus the district court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Aquino v. 99 Cents Only Stores LLC*, 2023 WL 8696362, at *6 (C.D. Cal. July 11, 2023) (quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes) (modifications adopted). The Ninth Circuit determined the revisions to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026. Nevertheless, the Ninth Circuit also instructs courts to examine the prior factors "comprehensively." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021).

## A.    Extent of discovery completed and stage of the proceedings

Plaintiff asserts that since the parties "extensively investigated the veracity, strength, and scope of he claims." (Doc. 82 at 19, citing St. John Decl. ¶ 9 [Doc. 70-3 at 13-14]; LippSmith Decl. ¶¶ 26-27 [Doc. 70-1 at 11].) According to Plaintiffs, the parties "undertook sufficient work to inform their analysis of the Settlement, including significant fact investigation; formal and informal written discovery; engaging a data analytics expert; and compiling, reviewing, and analyzing thousands of pages of documents and data Plaintiff and Defendants produced." (*Id.*) Mr. St. John reports, "Class Counsel reviewed and analyzed documents and data, including, but not limited to, the employment records of Plaintiff; sampling of time and pay data; and Defendants' employment and operations policies, practices, and procedures documents." (Doc. 70-3 at 17, ¶ 23.) Mr. LippSmith also reports Defendants "produced hundreds of pages of documents and company data through formal and informal

exchanges," including "company policies, company handbooks, employee files, payroll data for Plaintiff, and employee information for putative class members."  (Doc. 70-1 at 15, ¶ 39.)

Notably, "in wage-and-hour class actions, putative class counsel often gather evidence of company practices and … how often class members were denied breaks or forced to take late breaks." *Grady v. RCM Techs, Inc.*, 671 F. Supp. 3d 1065, 1074 (C.D. Cal. 2023) (internal quotation marks, citation omitted).  Mr. St. John reports, "Based on investigation and information discovered, Class Counsel believe there is sufficient evidence to support allegations that Defendants violated the Labor Code."  (Doc. 70-3 at 17 ¶ 26.)  Mr. LippSmith reports the review of the produced class sample data showed "the percentage of qualifying shifts when employees suffered a missed, late, or short meal period was 38.47%."  (Doc. 70-1 at 13, ¶ 33.)

Given the parties' discovery related to the class claims, which undoubtedly assisted with mediation and settlement discussions, the extent of discovery completed, and the stage of the proceedings support final approval of the Settlement.  *See In re Mego Fin. Corp. Sec. Litig*, 213 F.3d at 469 (finding these two factors favored approval of a class settlement when class counsel reported they "conducted significant investigation, discovery, and research); *see also Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1302 (S.D. Cal. Mar. 31, 2017) (explaining these factors favor settlement when "the parties have conducted extensive discovery and thoroughly litigated the issues").

### B.    Strength of the case

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."  *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Az. 1989)). Nevertheless, "the court need not reach any conclusions regarding the contested issues of fact and law that underlie the merits of the litigation."  *Carlin v. DairyAmerica, Inc.*, 328 F.R.D. 393 (E.D. Cal. 2018) (internal quotation marks, citation omitted).  A plaintiff can negotiate a fair settlement when "armed with sufficient information about the case to have been able to reasonably assess its strengths and value."  *Grady*, 671 F. Supp. 3d at 1073 (citation omitted).

Plaintiff asserts the parties "evaluat[ed] the substance of their claims and defenses and attendant

1    uncertainty." (Doc. 82 at 15.) Plaintiff observes that to prevail on his claims, he "must prove that

2    Labor Code violations demonstrate that Aggrieved Employees suffered losses and Defendants' conduct

3    gives rise to penalties." (*Id.*) He contends, "Even if Plaintiff established violations, Defendants likely

4    would characterize those violations as 'initial,' thus, making heightened '"subsequent violation'

5    penalties unwarranted." (*Id.*, citation omitted.) Further, Plaintiff previously asserted that "the Class's

6    expected recovery, weighed against the value of the settlement offer and considering the strength of

7    Plaintiff's case, supports approval of the Settlement." (Doc. 70 at 20.)

8        Approval of a class settlement is appropriate when "it appears that each side maintains a clear

9    idea of the strengths and weaknesses of their respective cases." *See Khaled v. Library Sys. & Servs.*,

10   2021 WL 2366952, at *5 (C.D. Cal. May 14, 2021). In the Settlement, the parties indicate they

11   "discussed Plaintiff's claims, theories for class certification, and Defendants' defenses thereto." (Doc.

12   70-2 at 13, Settlement ¶ 2.10.) In addition, the parties "analyzed the potential exposure of Defendants

13   on Plaintiff's claims, Defendants' potential liability for penalties and interest, as well as the potential

14   risks of any potential judgment against Defendants." (*Id.*) Given the extent of the discovery completed

15   —including the review of sample data to determine meal and rest break violation rates—it appears the

16   parties made informed decisions to evaluate the strength of the class claims. *See Grady*, 671 F. Supp.

17   3d at 1073. Because it appears the parties had sufficient information to evaluate the strengths of the

18   claims, as well as potential PAGA penalties, this factor weighs in favor of final approval.

19       **C.    Representation of the Class**

20       To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether

21   the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v.*

22   *Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021). In addition, a finding that "Class Counsel are

23   experienced and competent" supports a conclusion that the class is adequately represented. *Id.*; *see*

24   *also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent

25   counsel are better positioned than courts to produce a settlement that fairly reflects each party's

26   expected outcome in litigation."). Thus, the adequacy analysis under Rule 23(e)(2) "is redundant of

27   the requirements of Rule 23(a)(4)." *Almanzar v. Home Depot U.S.A., Inc.*, 2022 WL 2817435, at *9

28   (E.D. Cal. July 18, 2022) (citation omitted).

Plaintiff's interests appear aligned with those of class members, as they share a common interest in challenging the alleged wrongful wage and hour policies.  In addition, Class Counsel are clearly experienced in wage-and-hour class action litigation.  (*See* Doc. 70-1 at 2-9, LippSmith Decl. ¶¶ 4-16; Doc. 70-3 at 2-6, St. John Decl. ¶¶ 2-12.)  As discussed above, Plaintiff carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a).  Thus, the Court finds the requirement under Rule 23(e)(2) is also satisfied for purposes of final approval.  *See Flores v. Dart Container Corp.*, 2021 WL 1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

### D.    Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quotation marks, citations omitted).  Thus, the Court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining—as Plaintiff asserts (Doc. 82 at 22)— or if the agreement is the product of collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

When a settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the

settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal quotations, citations omitted).

### 1.    Whether there is a disproportionate distribution to counsel

The Settlement provides that Class counsel may request attorneys' fees "up to $665,000.00"— which is 35% the settlement fund.  (Doc. 70-2 at 7, Settlement ¶ 1.18; *see also id.* at 24, ¶ 4.7.)  The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Thus, the contemplated fees exceed the range typically awarded within the Ninth Circuit and may be deemed a disproportionate distribution if an upward departure from the benchmark is not warranted.  *See Miranda v. Am. Nat' Red Cross,* 2025 WL 1871128, at *3 (N.D. Cal. June 10, 2025) (directing counsel to show support—including a lodestar calculation—because such a percentage could be a disproportionate distribution).  Nevertheless, given the flexibility of an award *up to* $665,000.00, the Court finds the proposed fee award does not mandate a finding of collusion.  *See Koepeen v. Carvana, LLC*, 2024 WL 3925703, at *9 (N.D. Cal. Aug. 22, 2024) (finding a fee award of 35% of a settlement fund "is a red flag, [but] does not raise a concern regarding collusion").

### 2.    Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947.  The Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount.  *Lane v. Facebook, Inc.*, 696 F.3d 811, 832 (9th Cir. 2012); *In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  For example, where the

defendant agreed that "that it would not oppose any application for attorneys' fees not exceeding 25% of the settlement value," the Ninth Circuit determined such was ""a clear sailing attorney's fees provision." *Farrell v. Bank of Am. Corp., N.A.*, 827 Fed. Appx. 628, 632 (9th Cir. 2020) (internal quotation marks omitted).

Pursuant to the Settlement, "Defendants agree not to oppose" the request for fees in "an amount not to exceed $665,000.00." (Doc. 70-2 at 24, ¶ 4.7.) Thus, the Settlement includes a version of a "clear sailing" agreement. Nevertheless, the existence of the clear sailing provision is not necessarily fatal to approval. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948. Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id.* (citing *Staton*, 327 F.3d at 954).

As discussed below, the Court finds an award from the common fund is appropriate, and the modified award is reasonable in light of the time expended and results obtained. This factor does not mandate a finding of collusion, and the factor does not weigh against final approval of the settlement. *See Swain v. Anders Group, LLC*, 2023 WL 2976368, at *10 (E.D. Cal. Apr. 17, 2023) (finding a clear sailing provision did not weigh against final approval where the fees were "reasonable based on evidence submitted by class counsel"); *see also Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the Court analyzed the fee request and found it was reasonable).

### 3.    Whether there is a reversion to Defendants

Finally, the reversion of unclaimed funds or fees to a defendant is a "a telltale sign of collusion." *Jabbari v. Farmer*, 813 Fed. Appx. 259, 261 (9th Cir. 2020) (citation omitted). In the pending Settlement, the parties did not include a provision for any unawarded fees to revert to Defendants. (*See* Doc. 70-2 at 25, ¶ 4.11.2 [indicating money paid into the settlement fund is "non-reversionary" and "under no circumstance will there be any reversion to Defendants of any of the funds"].) Instead, the fees will be deducted from the settlement fund, and unawarded fees will be retained in the "Net Settlement Amount" that includes "the remaining portion of the Maximum Settlement Amount after deduction of the Fee and Costs Award, the Settlement Administration Costs,

the payment to the LWDA in the amount of $75,000 (representing 75% of the PAGA Penalty Payment), and the Service Payment."  (Doc. 70-2 at 7, ¶ 1.19.)  Because unawarded fees will be retained in the Net Settlement Amount for distribution to participating class members, this factor does not support a finding of collusion between the parties.  *See, e.g., Wise v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2020 WL 1492672, at *6 (E.D. Cal. Mar. 26, 2020) (where there was no reversionary cause, the court was "satisfied that the settlement is not the product of collusion")

> 4.      Findings on collusion

Based upon the factors set forth by the Ninth Circuit, the Court finds the Settlement "appears to be the product of serious, informed, non-collusive negotiations."  *See Rodriguez v. Danell Custom Harvesting, LLC*, 327 F.R.D 375, 383 (E.D. Cal. 2018) (citation omitted).  Thus, this factor supports final approval of the class settlement.

**E.      Amount offered and relief provided to the Class**

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should examine "the complete package taken as a whole," and the proposed settlement is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."  *Officers for Justice*, 688 F.2d at 625, 628.

Plaintiff contends the amount offered in settlement supports final approval.  (Doc. 82 at 18.) Mr. LippSmith reports that upon review of the class sample data produced by Defendants, Class Counsel determined a class average hourly pay of $21.23 and "[t]he percentage of qualifying shifts when employees suffered a missed, late, or short meal period was 38.47%."  (Doc. 70-1 at 13, ¶¶ 33-34.)  Using this information, counsel determined "the maximum meal and rest break award would be $3,518,511.59."  (*Id.*, ¶ 34.)  According to Mr. LippSmitth, Defendants' meal and rest break violations drove the settlement discussions," because these violations were "more discernable from Defendants' payroll data than, for example, violations for failures to pay overtime and waiting time, to reimburse business expenses, and for wage statement errors."  (*Id.*, ¶ 31.)  Assuming that each member of the Settlement Class had one unpaid overtime hour per week, counsel calculated that the potential unpaid

1    overtime damages total $2,743,828.89.  (*Id.* at 12-13, ¶ 30.)  Mr. LippSmith also reports counsel

2    calculated that "the maximum PAGA penalties are $14,389,800 … for meal violations and $14,389,800

3    for rest break violations."  (*Id.* at 14, ¶ 35.)  Because the LDWA would receive 75% of these PAGA

4    penalties, the maximum PAGA penalties for aggrieved employees is $7,194,900.  *See Lusk v. Five*

5    *Guys Enters. LLC*, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting the LWDA's portion

6    of an estimated PAGA penalty before calculating the percentage rate of recovery).  Based upon this

7    information, it appears the identified maximum potential recovery for class members and aggrieved

8    employees—for the meal, rest break, overtime, and PAGA penalties— totals $13,457,240.48.  Thus,

9    the gross fund designated is approximately 14% of the total calculated by Plaintiff's counsel; and the

10    anticipated net amount of $1,124,908.14[7] for Class Members and Aggrieved Employees is 8.4% of the

11    calculated maximum potential recovery.

12             Notably, the Ninth Circuit observed: "It is well-settled law that a cash settlement amounting to

13    only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In*

14    *re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459.  The recovery in this action is consistent with other

15    approved class action settlements in this Circuit.  *See, e.g., Gonzalez v. NCI Grp., Inc.*, 2020 WL

16    4547303, at *11 (E.D. Cal. Aug. 6, 2020) (approving a settlement representing 9% of maximum value

17    of the class' claims for violations of labor law, while acknowledging the percentage was "modest");

18    *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (finding the

19    gross settlement of approximately 15% of the potential recovery was fair); *Bravo v. Gale Triangle,*

20    *Inc.,* 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) (finding a 14% recovery of the plaintiff's

21    calculated maximum recovery was reasonable); *Cruz v. Sky Chefs, Inc.*, 2014 WL 7247065, at *5

22    (N.D. Cal. Dec. 19, 2014) (granting final approval to settlement of labor claims representing 8.6% of

23    maximum potential recovery).

24             The Settlement Administrator determined that the average recovery for the 551 class members

25    is $ 1,996.20; and the average PAGA payments for the 453 aggrieved employees is $55.19.  (Doc. 82-

26    4 at 5-6, Butler Decl. ¶¶ 19-21.)  Analyzing the factors identified in Rule 23, as discussed below, the

27

28    ---
      [7] This includes the total Net Settlement Fund of $1,099,908.14 for the class estimated by the Settlement
      Administrator, plus the $25,000 in PAGA awards for the aggrieved employees.  (*See* Doc. 82-4 at 5, ¶ 18.)

Court finds the amount offered and relief provided to the Settlement Class supports final approval of the Settlement.

### 1.    Costs, risks, and delays

"A central concern when evaluating a proposed class action settlement relates to the cost and risk involved in pursuing a litigated outcome." *Feltzs v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9 (C.D. Cal. Mar. 2, 2022) (quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modifications adopted].)  Settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).

Plaintiff contends "the Settlement provides adequate relief to the Class, considering costs, risks, and delay of trial and appeal." (Doc. 82 at 21; *see also id.* at 17-18.)  He observes that "to prevail, Plaintiff would have to obtain class certification, survive summary judgment, win trial, and overcome an appeal." (*Id.* at 21-22.)  Importantly, the claims in this action remain disputed.  As indicated in the Settlement, "Defendants deny all claims as to liability, damages, penalties, interest, fees, restitution, injunctive relief, and all other forms of relief, as well as the class and PAGA allegations asserted in the Action." (Doc. 70-2 at 11, ¶ 2.2.)  Plaintiff acknowledges that if Defendants defeated class certification or undermined the data extrapolation, "it would negate or significantly reduce any recovery." (Doc. 70 at 21.)  For example, Plaintiff notes that if the Court determined Defendants were "not subject to $200 PAGA penalties without prior notice by the Labor Commissioner or any court," the potential maximum penalties for the meal and rest break claims would be reduced from $28,797,600 to $9,599,200. (*See id.* at 21-22.)  In addition, Plaintiff notes that it would "be challenging to prove" labor law "violations impacting every employee[,] every week." (*Id.* at 22; *see also* Doc. 82 at 22.)  On the other hand, Plaintiff observes that the Settlement provides "certain and prompt relief" to the class for the alleged violations. (Doc. 82 at 22, citation omitted.)

Notably, wage and hour class actions are naturally "time-consuming and expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal. May 19, 2017) (citation omitted).  If the Settlement is rejected, the parties would have to engage in further litigation, including seeking—and challenging—class certification and additional discovery on the issue of damages.  The time and expense of continued litigation could outweigh any additional recovery.  As Plaintiff

contends, the proposed settlement provides for immediate recovery for the class. Due to the disputed liability, risk to the claims of class members, costs of future litigation that may reduce the recovery to class members, and delay in payments if the settlement is not approved, this factor weighs in favor of final approval of the Settlement. *See Rodriguez*, 563 F.3d at 966 (finding that the risk, expense, complexity and duration of litigation support settlement); *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class" [citation omitted]).

### 2.    Method of distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id*.

### a.    Distribution to class members

Settlement Class members are not required to take any action, such as submitting a claim form, to receive their settlement payment. (Doc. 70-2 at 16, ¶ 4.2.1.) The Settlement Administrator will "distribute checks via first-class mail to Settlement Class Members and aggrieved employees for their respective Individual Payment Amounts no later than ten (10) calendar days after the Settlement Administrator receives the Settlement Proceeds from Defendants or as otherwise ordered by the Court." (*Id.* at 25, ¶ 4.11.3.) The individuals will have 90 days to deposit their checks, after which "undeposited checks… will be cancelled and voided." (*Id.*, ¶ 4.11.4.) The Settlement Administrator will then "redistribute the remaining uncashed Settlement Proceeds to Class Members and aggrieved employees who cashed their payments from the initial distribution of Settlement Proceeds," using the same *pro rata* formulas as the first distribution. (*Id.*)

Under the terms of the Settlement, the class members were only required to take action if they wished to opt-out of the settlement, object to any of the terms, or dispute the amount of their individual settlement share. Because the class members are not required to submit and claim form, the proposed method of distribution facilitates payment for legitimate claims without being "unduly demanding" upon the Settlement Class. Thus, this factor weighs in favor of final approval. *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs in favor of a finding that the settlement agreement is fair, reasonable and adequate" where a claim form was not required).

### b.     Distribution to a cy pres beneficiary

Since many class action settlements result in unclaimed funds, the parties should have a plan for distribution of the unclaimed funds. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). Options for such distribution include cy pres distribution, escheat to the government, and reversion to the defendants. *Id.*, 904 F.2d at 1307. Here, the parties agree that after the second distribution to participating class members, undeposited checks will be cancelled and voided after 90 days, and the funds shall "be delivered to Legal Aid at Work by the Settlement Administrator, or shall otherwise be distributed as ordered by the Court." (Doc. 70-2 at 25, ¶ 4.11.4.) Thus, the parties indicate that Legal Aid at Work shall be a cy pres beneficiary in this matter for unclaimed funds from the second distribution of checks.[8]

The Ninth Circuit determined a proposed cy pres recipient should be "tethered to the nature of the lawsuit and the interest of the silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011). In other words, the Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the cy pres beneficiaries." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (citing *Nachshin*, 663 F.3d at 1038). The Court explained that without such tethering, the distribution of funds "may create the appearance of impropriety" by catering "to the whims and self interests of the

---

[8] The Settlement also originally provided that the cy pres beneficiary would receive "any amounts that would have been paid to Class Members who timely request exclusion." (Doc. 70-2 at 25, ¶ 4.11.4.) The Court struck this portion of ¶ 4.11.4 from the Settlement at the preliminary approval stage. (Doc. 73 at 36.) Rather, the Court indicated that "pursuant to Paragraph 4.2.4, the payments calculated for those who request exclusion **SHALL** be retained in the Net Settlement Fund, and the payments to participating class members shall be proportionally increased." (*Id.*)

1    parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1038. Thus, a cy pres award should not

2    benefit a group that is "too remote from the plaintiff class." *Six Mexican Workers*, 904 F.2d at 1308.

3    The Ninth Circuit directs courts to consider whether awards to the beneficiary "(1) address the

4    objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty

5    that any member will be benefitted." *See Nachshin*, 663 F.3d at 1039-1040 (citing *Six Mexican*

6    *Workers*, 904 F.2d at 1307). Further, the Court must consider whether the cy pres distribution is

7    appropriate given the "size and geographic diversity" of the class members. *Id.* at 1040-1041 (citing,

8    e.g., *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002); *Houck on Behalf*

9    *of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989)).

10    At the preliminary approval stage, the Court observed that "Plaintiff did not provide any

11    analysis of these factors to assist the Court in evaluating whether Legal Aid at Work is an appropriate

12    cy pres beneficiary." (Doc. 73 at 36-37.) The Court ordered:

13    > In support of the request to appoint Legal Aid at Work—or any other cy
14    > pres beneficiary—Plaintiff **SHALL** clearly address the factors identified
      > by the Ninth Circuit in *Nachshin* in seeking final approval of the
15    > Settlement. Moreover, the Ninth Circuit indicated that a district court
      > should also examine any "between the cy pres recipient and the parties or
16    > their counsel." *In re Google Referrer Header Priv. Litig.*, 869 F.3d 737,
      > 744 (9th Cir. 2017), *vacated on other grounds, sub nom, Frank v. Gaos*,
17    > 139 S. Ct. 1041, 203 L. Ed. 2d 404 (2019). Toward that end, it [is]
      > important for the Court to consider factors such as "the nature of the
18    > relationship, the timing and recency of the relationship, the significance of
      > dealings between the recipient and the party or counsel, the circumstances
19    > of the selection process, and the merits of the recipient." *Id.*; *see also City*
      > *of Long Beach v. Monsanto Co.*, 2020 WL 10540857, at *2 (C.D. Cal.
20    > July 13, 2020) ("The parties shall also identify any relationship they or
      > their counsel have with the proposed cy pres recipient.") Thus, Plaintiff
21    > shall also address whether there is any past or current relationship between
      > Class Counsel and Legal Aid at Work.

22    (Doc. 73 at 36, n. 5.) Despite this instruction, Plaintiff does not address the propriety of appointing

23    Legal Aid at Work as the cy pres beneficiary in the pending motion. (*See generally* Doc. 82.) For this

24    reason, the Court **DECLINES** to appoint Legal Aid at Work as the cy pres beneficiary.

25    Nevertheless, the Ninth Circuit observed that issues related to the identity of a cy pres

26    beneficiary are not generally ripe until funds remain unclaimed. *See Rodriguez v. West Publ'g Corp.*,

27    563 F.3d 948, 966 (9th Cir. 2009) (finding cy pres distribution "becomes ripe only if entire settlement

28    fund is not distributed to class members" and declining to determine propriety of cy pres distribution at

that time).  The Court explained that where a cy pres distribution is contingent on the outcome of the claims process for a cash distribution, issues regarding the identification of recipients "will not be ripe until it is determined that available cash remains in th[e] fund after the claims process has concluded." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012).  At this point in the proceedings, it is impossible to predict whether funds will from the second distribution to class members.  The Court will retain jurisdiction over the Settlement, and the parties may seek approval of an appropriate cy pres beneficiary if the issue becomes ripe.  *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 642 (S.D. Cal. 2011) (finding the cy pres recipient need not be identified prior to granting final approval); *see also Stark v. Patreon, Inc.*, 2025 WL 1592736, at *4 (N.D. Cal. June 5, 2025) (observing that where the parties agreed a second *pro rata* distribution would occur to participating class members for uncashed funds before any payment to a cy pres beneficiary, the issue of identifying the cy pres recipient was "not ripe" at the final approval stage).  Accordingly, the failure to show Legal Aid at Work is an appropriate cy pres beneficiary does not weigh against final approval.

### 3.    Attorneys' fees

Under Rule 23, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'" *McKinney-Drobnis v. Oreshack*, 16 F.14th 594, 607 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii).  The Ninth Circuit explained it "interpreted the amended Rule 23(e)(2) as imposing an obligation on district courts to 'examine whether the attorneys' fees arrangement shortchanges the class.'" *Id.*, quoting *Briseño*, 998 F.3d at 1024.  "In other words, the new Rule 23(e) makes clear that courts must balance the proposed award of attorney's fees vis-à-vis the relief provided for the class in determining whether the settlement is adequate for class members." *Id.* (internal quotation marks, citation omitted).

Plaintiff contends this factor supports final approval, because "[t]he Settlement contains reasonable attorney fee terms."  (Doc. 82 at 22.)  The Court finds the modified fees to be awarded are fair, adequate, and reasonable.  The Court-approved payment shall be made by the Settlement Administrator within 10 days of Defendants providing the funds to the Settlement Administrator. (Doc. 70-2 at 24, ¶ 4.11.1)  In that same 10-day period, the Settlement Administrator will issue the other approved payments, including to Class Members.  (*Id.*)  Thus, counsel will receive payment in

the same period of time as Class Members, and the timing of payment does not weigh against final

approval of the Class Settlement. *See Perks v. ActiveHours, Inc.*, 2021 WL 1146038, at *6 (N.D. Cal.

Mar. 25, 2021) (finding the timing did not weigh against approval where both class counsel and class

members were to receive payments after final approval).

### 4. Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C)(iv). Specifically, "parties seeking approval must file a statement identifying

any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). The parties did not

identify any such agreement at the preliminary approval stage. However, following preliminary

approval, the parties entered into a subsequent agreement for Defendants to pay additional funds, to

cover the claims of the Omitted Class Members, using the formula identified in the Settlement to

calculate payments. (Doc. 76.) This agreement ensures that all class members are treated equitably.

Accordingly, this factor does not weigh against final approval.

### F.    Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members

equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "A distribution of relief that favors

some class members at the expense of others may be a red flag that class counsel have sold out some

of the class members at the expense of others, or for their own benefit." *Hilsley*, 2020 WL 520616 at

*7 (citation omitted).

The parties agreed that class members who did not timely opt-out of the Settlement will receive

a *pro rata* share of the Net Settlement Amount, calculated by:

> (i) dividing the Settlement Class Member's total number of workweeks
> worked for Defendants in California during the Class Period by the total
> number of workweeks worked by all Settlement Class Members for
> Defendants during the Class Period, and (ii) multiplying that pro rata share
> by the allocated amount of the Net Settlement Amount. Any workweeks
> during the Class Period in which a Settlement Class Member did not
> actually work (for example, while on a leave of absence, etc.) are not
> included in calculating that Settlement Class Member's Individual
> Payment Amount.

(Doc. 70-2 at 16, ¶ 4.2.2.) Because the Settlement provides *pro rata* distribution based upon the

number of workweeks, the agreement treats the class members equitably, and the proposed distribution

1  plan supports final approval. *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021)

2  (observing the calculation of payments to class members "on a pro-rata basis based on the number of

3  compensable workweeks each member worked … is fair and treats class members equitably"); *see also*

4  *Morgan v. Rohr*, 2025 WL 1285830 at *14 (S.D. Cal. May 1, 2025) (finding a *pro rata* distribution had

5  "little to no risk of unequal treatment" and weighed in favor of approving the settlement terms);

6  *Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (noting that

7  in the preliminary approval stage, "the Court approved the proposed plan pro rata allocation based on

8  the number of workweeks the class member performed work during the Class Period").

9     **G.    Views of counsel**

10     As addressed above, Class Counsel are experienced in class action litigation. Mr. LippSmith

11  indicates a belief that "the Settlement is beyond fair and adequate." (Doc. 82-1 at 9, ¶ 26.) He states,

12  "this Settlement represents a tremendous result for the Class Members, Aggrieved Employees, and

13  LWDA after Class Counsel's serious efforts on a contingency basis." (*Id.*) Mr. LippSmith indicates

14  that the "continue[s] to support approval of the Settlement without any hesitation whatsoever." (*Id.*).

15  Similarly, Mr. St. John believes that "[t]he settlement is fair, reasonable, and adequate; fulfills the

16  purpose of the PAGA statute; and is in the best interests of the Class, the State of California, and

17  PAGA aggrieved employees." (Doc. 70-3 at 22, ¶ 32.) The Settlement also indicates that Defendants

18  "believe this Settlement is a fair, adequate, and reasonable Settlement of this Action…" (Doc. 70-2 at

19  14, ¶ 2.14.) These opinions of Class Counsel and Defendants' counsel are entitled to significant

20  weight and support approval of the Settlement. *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528

21  ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with

22  the facts of the underlying litigation"); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447

23  (E.D. Cal. 2013) ("the trial court is entitled to, and should, rely upon the judgment of experienced

24  counsel for the parties").

25     **H.    Reaction of Class Members to the Settlement**

26     "[T]he absence of a large number of objections to a proposed class action settlement raises a

27  strong presumption that the terms of a proposed class action settlement are favorable to the class

28  members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing

the court may assess the reaction of class members by considering "how many class members submitted … objections" at the final approval stage).

Plaintiff agreed to the terms of Settlement Agreement.  (*See* Doc. 70-2 at 29.)  After receiving the Court-approved Notice, Class Members reacted very favorably to the proposed settlement terms, because there were no objections or requests for exclusion.  (Doc. 86 at 3, Butler Supp. Decl. ¶¶ 9-10.)  This "absence of a negative reaction[] strongly supports settlement."  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *see also Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("[t]he lack of any objection weighs in favor of final approval of the settlement"); *Taylor v. Populous Group, LLC*, 2023 WL 139724, at *3 (S.D. Cal. Jan 9, 2023) (the class members' reaction—after notice of the settlement terms and "an opportunity to express their reactions"—supported final approval where no objections to the Settlement were filed).  Accordingly, this factor weighs in favor of final approval.

## I. Presence of a government participant

Finally, the Ninth Circuit instructs the Court to consider "the presence of a governmental participant."  *Staton*, 327 F.3d at 959.  However, no government entities participated in this case, and no government entities are parties to the Settlement.  There is only a government beneficiary with the payment to the LWDA.  Consequently, this factor does not weigh in the Court's analysis.

## III. Conclusion

The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval of the Settlement, and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the request for final approval of the Class Settlement is **GRANTED**.

## APPROVAL OF PAGA SETTLEMENT

California adopted its Private Attorney General Act to allow individual plaintiffs "to bring a civil action to collect civil penalties for Labor Code violations previously only available in enforcement actions initiated by the State's labor law enforcement agencies." *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff now acts "as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a). PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  *Id*.  A judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government."  *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1). Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75% directed to the LWDA and 25% to aggrieved employees.  *Id.* § 2699(i).  Any proposed settlement of PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972; *see also Botonis v. Bimbo Bakeries USA, Inc.*, 2024 WL 4326916 (E.D. Cal. Sept. 26, 2024) (following *Haralson* and evaluating whether a proposed PAGA settlement was "fundamentally fair, reasonable, and adequate").  This standard is derived principally from the LWDA, which indicated:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*See O'Connor v. Uber Techs., Inc*., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citation omitted). When a proposed settlement involves overlapping class action and PAGA claims, courts may employ

a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *Cooks v. TNG GP*, 2020 WL 5535397 at *9-10 (E.D. Cal. Sept. 15, 2020) (same). "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled." *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

Plaintiff reports that the proposed Settlement Agreement was submitted to the LWDA in compliance with the Labor Code. (Doc. 70 at 3.) The LWDA did not comment on the notice or otherwise contact Class Counsel. (Doc. 82 at 2-3; Doc. 82-1 at 3, LippSmith Decl. ¶ 7.) The fact that the LWDA has not commented upon—or objected to—the Settlement supports final approval. *See Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *8 (E.D. Cal. Apr. 12, 2023) (noting the LWDA did not respond to the submission of the proposed settlement prior to granting final approval of the PAGA settlement); *Moreno v. Capital Bldg. Maint. & Cleaning Servs.*, 2021 WL 1788447, at *8 (N.D. Cal. May 5, 2021) ("The lack of comment from the LWDA weighs in favor of finding that the PAGA settlement is reasonable.").

The maximum settlement fund of $1,906,745.14 appears sufficiently robust—with an estimated $1,099,808.14 going to the class members—such that the Court finds the proposed agreement fulfills the purposes of PAGA, to address the alleged labor violations. Under the Settlement, $100,000 of the gross amount is designated as the PAGA payment. (Doc. 70-2 at 7, ¶ 1.18.) The Settlement properly designates 75% of the PAGA funds to the LWDA—in the amount of $75,000 gross amount—and the remaining $25,000 to the aggrieved employees. (*Id*. at 16, ¶ 4.2.3.) The amount proposed to settle the PAGA claims, approximately 5% of the gross settlement fund, is consistent with other approved PAGA payments from class action funds. *See*, *e.g*., *Kryzhanovskiy v. Amazon.Com Servs*., *Inc.,* 2024 WL 4189936, at *15-16 (E.D. Cal. Sept. 12, 2024) (granting final approval of a class settlement that included a PAGA payment of $100,000 from a gross settlement fund of $3,000,000); *Syed v. M-I, LLC*, 2017 WL 3190341 at *9 (E.D. Cal. July 27, 2017) (granting final approval to a settlement, including $100,000.00 in PAGA penalties for a California class with a $3,950,000 gross settlement fund); *Scott v. Blackstone Consulting, Inc.*, 2024 WL 271439, at *8 (S.D. Cal. Jan. 24, 2024) (approving a PAGA

payment that was 5% of the gross settlement amount).  Consequently, the Court concludes approval of the settlement related to the PAGA claims is fair, reasonable, and adequate in light of the PAGA's public policy goals.

## CLASS REPRESENTATIVE PAYMENT

A class representative may "receive a share of class recovery above and beyond her individual claim" with a service payment, also known as an "incentive payment."  *China Agritech, Inc. v. Resh*, 584 U.S. 732, 747 n. 7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for reasonable incentive payments").  However, additional payments for class representatives are *not* to be given routinely.  The Ninth Circuit observed: "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard."  *Staton*, 327 F.3d at 975 (citations omitted).  Further, "'excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion.'"  *Id.* (citation omitted).

## I.     Awarding a Service Payment

The Ninth Circuit emphasized that "district courts must be vigilant in scrutinizing all incentive awards."  *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In evaluating a request for a service payment, the Court must consider: "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced."  *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC LLC,* 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton*, 327 F.3d at 977.  Service payments may also recognize a plaintiff's "willingness to act as a private attorney general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

Pursuant to the Settlement, Plaintiff may seek a "Service Payment for an amount not to exceed $10,000" from the gross settlement.  (Doc. 70-2 at 24, ¶ 4.8.)  At the preliminary approval stage, the Court found that Plaintiff provided "limited information regarding his actions on behalf of the class."  (Doc. 73 at 30-31, citing Doc. 70-4.)  The Court also observed Plaintiff did not provide "a clear

1  estimate for the Court to evaluate the time expended," because Plaintiff simply estimated that he "spent

2  dozens of hours working on this case to date. (*Id.* at 31, quoting Doc. 70-4 at 4, ¶ 10.)  The Court found

3  the contemplated payment appears to be excessive but granted preliminary approval "given the

4  flexibility for an award *up to* $10,000." (*Id.*; *see also id.* at 31, n. 4.)  The Court ordered that at the final

5  approval stage, "**Plaintiff must provide evidence supporting the requested service payment**." (*Id.*

6  at 30, emphasis in original.)  Plaintiff now requests a service payment in the amount of $10,000 and

7  filed a declaration to support the request. (Doc. 82 at 32-33; *see also* Doc. 82-3.)

8  **A.    Actions taken to benefit the class and time expended**

9  The Eastern District has awarded service payments for "substantial efforts taken as a class

10  representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's*

11  *Sporting Goods, Inc.*, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks,

12  citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.,* 2017 WL

13  749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments when each plaintiff reported

14  "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit" [modification

15  adopted]).  Plaintiff reports that he spent expended the following time:

16  - 1-2 hours speaking with counsel for an initial interview

17  - At least 2 hours looking for documents related to his employment,
18     reviewing that information, and sharing the documents with counsel

19  - 10-15 hours speaking with counsel and reviewing drafts of the
       complaint

20  - 5 hours "considering which of Defendants' employees [he] could
21     contact for corroborating information, contacting those individuals,
       considering the responses of those individuals, and relaying to [the]
22     attorneys how these efforts turned out."

23  - 10 hours speaking with one of Defendants' employees "over the
       course of the case in an effort to obtain as much information as
24     possible about Defendants' business practices and any additional facts
       for context about [Plaintiff's] own experience working for
25     Defendants."

26  - 30-60 minutes "during the week of any and every scheduled hearing"
       to check-in with counsel[9]

27

28  [9] It is unclear what "scheduled hearing[s]" Plaintiff refers to, as this Court took pending matters under
    submission and vacated the hearings.

- 15-20 hours responding to Defendants' written discovery requests, including reviewing the requests, speaking to counsel, looking for documents, providing responses, and verifying the final responses

- 30 minutes talking to his attorney about the possibility of being deposed

- 8 hours reviewing "the information [he] provided for the case, the discovery responses [he] provided, and practicing oral responses" to prepare for the potential deposition

- 5 hours preparing for the first mediation, including time spent with counsel, reviewing the case status, and reviewing discovery responses

- 4 hours preparing for the second mediation, including reviewing his discovery responses, the status, and communications with counsel

(Doc. 82-3 at 2-4, Cruz Sanchez Supp. Decl. ¶¶ 4-11.)  Thus, in total it appears Plaintiff identifies approximately 62-72 hours engaged in tasks related to this litigation.[10]

Plaintiff likely would have taken many of these actions even if proceeding only with his individual claims.  On the other hand, by reviewing documents and assisting with discovery, his actions undoubtedly benefitted Class Members, who will receive an average payment of $1,996.20 and up to $5,621.05.  (*See* Doc. 82-4 at 6, ¶ 19.)  Thus, the Court finds the amount of time expended and actions taken on behalf of the class support a service payment for Plaintiff.

**B.    Workplace retaliation**

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  However, this Court observed previously that when a class representative was a former employee—as here— retaliation by the defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280

---

[10] Plaintiff reports he also took a total of four days off work "to be available" to counsel on the days where counsel engaged in mediation, the day counsel filed the motion for preliminary approval, and the day counsel filed the pending motion for final approval.  (Doc. 82-3 at 4, ¶ 12.) Plaintiff did not provide any estimate for time he engaged in tasks related to the litigation on the days he elected to take off work. Plaintiff did not attend the mediation sessions and does not report that he actually communicated with counsel on those days.  Likewise, it is unclear whether Plaintiff had any communications with Class Counsel on the days they filed the motions for preliminary and final approval.  The billing records from Mr. LippSmith—whose firm finalized and filed the motions—do not indicate that any communications with Plaintiff occurred on either of the filing dates of May 30, 2024 or February 25, 2025.  (*See* Doc. 82-1 at 44, 52.)  Accordingly, the Court declines to count Plaintiff's days off work as time expended on this matter.

(E.D. Cal. 2014).  Because Plaintiff cannot suffer workplace retaliation from Defendants, this factor does not support a service payment.

### C.    Reputational risk

The Court may consider whether a class representative suffered a risk to his or her reputation in being a named plaintiff.  However, a risk to the named plaintiff's reputation cannot be conclusory or speculative to support a service payment.  *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020) (finding the court did not abuse its discretion in reducing a requested service payment from $10,000 to $5,000 because any potential reputational risk lacked evidentiary support).  For example, this Court found an identified reputational risk was "real and substantial" where the plaintiff reported that "[f]uture potential employers need only search for [the plaintiff's name] and her former employer's name to learn that she has pursued wage and hour claims against her former employer." *Flores v. Dart Container Corp.*, 2021 WL 1985440, at *10 (E.D. Cal. May 17, 2021).

Plaintiff does not assert that he suffered a reputational risk by proceeding as a class representative in this action.  (*See generally* Docs. 70-4, 82-3.)  Notably, if Plaintiff elected file his *individual* claims rather than a class action, the complaint will still include his name as the plaintiff. The Court declines to speculate that Plaintiff suffered any risk to his reputation by proceeding as the class representative.  Therefore, this factor does not support the requested service payment.

### D.    Financial risks

Courts in the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive payment to a class representative.  *See, e.g., Vasquez,* 266 F.R.D. at 491 ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for any costs awarded in favor of Defendant"); *Herrera v. Wells Fargo Bank, N.A.,* 2021 WL 9374975, at *14 (C.D. Cal. Nov. 16, 2021) (evaluating a service payment request and noting the class representatives "faced financial risks should [the defendant] seek to recover the cost of the defense").  However, Plaintiff does not report that he bore such a risk, or identity a financial risk as a reason to support the request.  (*See* Docs. 70-4, 82-3; *see also* Doc. 82 at 32-33.)  The Court declines to assume that Plaintiff was aware of—or bore—any financial risk.  Therefore, this factor does not support a service payment to Plaintiff.

### E.    Willingness to act as private attorney general

The Ninth Circuit observed that incentive payments may recognize a named plaintiff's "willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Here, Plaintiff acted as a private attorney general, which will result in payments to the LWDA and aggrieved employees under PAGA. (*See* Doc. 70-2 at 7, Settlement ¶ 1.18.) Accordingly, this factor supports a service payment for the class representative.

## II.    Reasonableness of Plaintiff's Request

Considering the factors set forth above—including the actions taken by Plaintiff on behalf of the class, the time expended, benefit received, and his willingness to proceed as a private attorney general—a service payment is appropriate. To evaluate the reasonableness of a requested service payment, the Court may consider several factors, such as the time and actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive payment is compared to the average award class members expect to receive. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015); *Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received"); *Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) ("courts consider the proportionality between the incentive payment and the range of class members' settlement awards").

### A.    Actions of the class representative

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11. Also, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant." *Id.* In light of these facts, the Court found an award of $7,500 for

each plaintiff was appropriate for the time, efforts, and risks undertaken.

Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class." *Bond*, 2011 WL 2648879, at *15. Similarly, the Northern District determined class representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

Although Plaintiff was not required to attend a mediation session, it appears his remaining actions are comparable to the plaintiffs in *Alvarado*, *Bond*, and *Wade*. Despite being required to undertake fewer tasks in this matter, Plaintiff seeks a service payment that is greater than the service payments those class representatives. Accordingly, this factor does not support a conclusion that the service payment requested by Plaintiff is fair or reasonable.

### B.     Hourly rate of compensation

Courts have considered the hourly rate of compensation for a class representative. *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable. *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas*, 2014 WL 12382279, at *14-15.

For example, this Court criticized a requested award that would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. In evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the defendant. *Id.* at 366, n.3. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk … for example, for time they could have

46

1  spent at their jobs." *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award of

2  "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded the $13,500 total up to

3  $15,000 to "incorporate[] an extra incentive to participate in litigation."  *Id.*

4         The Central District declined to approve service payments to the class representatives where the

5  proposed amount resulted in "extremely high hourly rates."  *Moss*, 2018 WL 5099291, at *11.  The

6  court observed the requested award of $25,000 for each of the class representatives, Moss and Watkins,

7  was "the equivalent of a payment of approximately $210 per hour to Moss and $470 per hour to

8  Watkins."  *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to each

9  class representative.  *Id.*

10         Plaintiff reports that he was "an hourly-paid, non-exempt employee" while working for

11  Defendants. (*See* Doc. 70-4 at 2, ¶ 2.)  Although Plaintiff did not provide any information concerning

12  his hourly rate, Class Counsel report the average hourly rate of pay from Defendants was $21.23.  (Doc.

13  7-1 at 13, ¶ 34.) The requested service payment to Plaintiff—based upon the estimated 62 to 72 hours

14  he spent on the matter—would result in an hourly rate of $139 to $161.  This hourly rate is clearly

15  excessive.  *See Ontiveros*, 303 F.R.D. at 366; *see also Leverage v. Traeger Pellet Grills, LLC*, 2017

16  WL 6405619 (N.D. Cal. Dec. 15, 2027) (approving class representative awards that "result[ed] in an

17  approximately $50 hourly rate"); *Pappas, Inc.*, 2014 WL 12382279, at *14-15 (reducing the service

18  awards to $58 per hour for each class representative).  If the Court were to adopt the $50 hourly rate

19  approved in *Ontiveros* and *Leverage*, the service payment for Plaintiff would be reduced to a maximum

20  of $3,600.  Thus, the hourly rate does not support a service payment in the amount requested.

21        **C.**    **Comparison of the award to those of the Class Members**

22         The Ninth Circuit indicated the Court may consider the "proportion of the [representative]

23  payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-*

24  *Rental Antitrust Litig.*, 779 F.3d at 947; *see also Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244,

25  1265 (C.D. Cal. 2016).  For example, in *Rankin*, the Court approved a service award of $5,000, where

26  the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day

27  mediation."  *Id.*, 2011 WL 13239039, at *2.  The Court found the amount reasonable, observing it was

28  "reasonably close to the average per class member amount to be received."  *Id.*

The requested award for Plaintiff is approximately 5 times the average award of $1,996.20 for the Class Members.  In addition, the requested award is approximately 0.52% of the gross settlement fund, which appears excessive.  *Compare with In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015) (awarding $5,000 as a service payment, which was 0.17% of the gross settlement fund); *Spann,* 211 F.Supp.3d at 1265 (awarding a class representative payment of $10,000, which was less than 0.25 percent of the gross settlement).  Given the disparity between the average award and Plaintiff's requested service payment—as well as the percentage of the settlement fund— this factor does not support the amount requested and instead favors a reduction to the service award.

## III.    Amount to be Awarded

A "substantial effort" by a plaintiff is necessary to support a service payment of $10,000.  *See Coburn v. City of Sacramento,* 2020 WL 7425345, at *8 (E.D. Cal. Dec. 17, 2020); *see also Amaro v. Gerawan Farming Inc*., 2020 WL 6043936, at *10 (E.D. Cal. Oct. 12, 2020) (awarding a payment of $10,000 to plaintiffs who each spent over 370 hours during the course of the litigation on tasks such as "talking to co-workers, assisting class counsel, attending the mediation, and organizing class members to keep them apprised of the status of [the] case"); *Valentine v. Rehab. Ctr. of Santa Monica Holding Co. GP, LLC,* 2021 U.S. Dist. LEXIS 243660, at *13-14 (C.D. Cal. Dec. 20, 2021) (finding the class representative failed to justify a service enhancement of $10,000, though the plaintiff reported 59.5 hours on the litigation, during which she "was deposed, worked closely with [class] counsel, assisted in the preparation of pleadings, provided factual information and assisted in identifying potential witnesses").

Because the factors discussed above support an incentive award— and the actions of Plaintiff clearly benefited Class Members—a service payment is appropriate.  However, the amount requested is not fair or reasonable.  As noted above, the application of a $50 hourly rate to the estimated 62 to 72 hours in Plaintiff's declaration results in an award of $3,100 to $3,600.  On the other hand, Plaintiff released all potential claims related to his employment with Defendants.  (*See* Doc. 70-2 at 4-5, Settlement ¶ 1.8; Doc. 70-4 at 3, Cruz Sanchez Decl. ¶ 7.)  This Court indicated that a plaintiff sacrificing "the opportunity to bring several of his own claims" supported an increase to a service payment, even if "unclear whether those claims would have had merit."  *Ontiveros*, 303 F.R.D. at 366.

1    Thus, a small increase to the award is appropriate.  *See id.*

2            The Court finds an award of $5,000 is fair and reasonable in this matter.  This amount

3    compensates Plaintiff for his time expended, is about 2.5 times the average payment to Class Members,

4    and is approximately 0.26% of the gross settlement fund.  In addition, this amount appropriately

5    compensates Plaintiff for the time expended on actions related to this litigation, while including a

6    modest increase for the broader release of his claims.  Accordingly, the Court grants Plaintiff's request

7    for a service payment in the modified amount of $5,000.[11]

8                              **REQUEST FOR ATTORNEYS' FEES**

9            Pursuant to the Settlement, Class Counsel may request fees in the amount of $665,000.00,

10   which is 35% of the gross settlement fund.  (Doc. 70-2 at 7, ¶ 1.18; *see also id.* at 24, ¶ 4.7.)   Class

11   Counsel now request this amount be awarded in attorney fees, asserting the amount is reasonable and

12   fair.  (Doc. 82 at 24-31.)  Defendants agreed to not oppose this fee request.  (Doc. 70-2 at 24, ¶ 4.7.)

13   **I.    Legal Standards**

14           "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class

15   action settlement agreement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court

16   "may not uncritically accept a fee request," but must review the time billed and assess whether it is

17   reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F.

18   Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5

19   (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended

20   without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984)

21   (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the

22   'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining

23   a court should not "accept[] uncritically [the] representations concerning the time expended").

24           Class Counsel assert the reasonableness of the fee request should be evaluated under California

25   law, because the Court has diversity jurisdiction over this action.  (Doc. 82 at 24, citing *Hartless v.*

26

27   _____

     [11] This service payment also aligns with the amount considered "presumptively reasonable" by courts in the
     Ninth Circuit.  *See Weiner v. Ocwen Fin. Corp.*, 2024 WL 4458383, at *6 (E.D. Cal. Oct. 10, 2024); *see also*
28   *Wong v. Arlo Techs. Inc.,* 2021 WL 1531171, at *12 (N.D. Cal. Apr. 19, 2021) (noting that "[s]ervice awards as
     high as $5,000 are presumptively reasonable" in the Ninth Circuit and collecting cases).

                                              49

*Clorox Company*, 273 F.R.D. 630, 642 (S.D. Cal. 2011).)  Indeed, the Ninth Circuit indicated that state law governing underlying claims in a diversity action "also governs the award of fees."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Circ. 2002). However, Class Counsel contend the fee request is also reasonable under Ninth Circuit precedent.  (Doc. 82 at 25-32.)  Notably, as discussed below, both state and federal courts consider similar tests to evaluate the reasonableness of the fees requested from a settlement fund.

The Court has discretion to use either a lodestar or percentage of the common fund calculation to evaluate a fee request.  *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022); *see also Lafitte v. Robert Half Int'l Inc.*, 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts.").  The Ninth Circuit observed that "either method may … have its place in determining what would be reasonable compensation."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate, and reasonable."  *Staton*, 327 F.3d at 963 (quoting Fed. R. Civ. P. 23(e)).

### A.    Lodestar method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Lafitte*, 1 Cal. 5th at 489.   The product of this computation, the "lodestar" amount, yields a "presumptively reasonable" fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Edmo v. Corizon, Inc.*, 97 F.4th 1165, 1168 (9th Cir. 2024).  Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional

relationship with the client, and (12) awards in similar cases.[12]

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *see also Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant criteria set forth in *Kerr*" to determine whether to deviate from the lodestar).  Likewise, under California law, "[o]nce the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented."  *Laffitte*, 1 Cal.5th at 489 (internal quotation marks omitted).

### B.    Percentage from the common fund

As the name suggests, under this method, "the court makes a fee award on the basis of some percentage of the common fund."  *Florida*, 915 F.2d at 545 n. 3.  "The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark."  *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010); *see also In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (noting the Ninth Circuit established "[t]he benchmark percentage is 25%" of the common fund).  Although California courts have not adopted the same 25% benchmark, this percentage "is within the range of what courts will award as a percentage of the common fund in California."  *Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1000 (N.D. Cal. 2017) (citations omitted).

To evaluate whether the requested percentage is reasonable, courts may consider a number of factors, including: (1) the results obtained for the class; (2) the risks undertaken by class counsel, including the complexity of the issues; (3) the length of the professional relationship between class counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check.  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990);  *see also Lafitte*, 1 Cal. 5th at 504 (determining the reasonableness of percentage fee through considering "the risks and potential value of the litigation;" the "contingency, novelty and difficulty" of the case; and "the skill shown by counsel, the number of hours worked, and

---

[12] The Ninth Circuit has since determined the "desirability" of a case is no longer a relevant factor.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

the asserted hourly rates"). The percentage awarded as fees may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear. *Graulty*, 886 F.2d at 272; *see also In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure").

### C.    Fee applicants' burden

Notably, the Court must consider similar factors under both the lodestar method and awarding a percentage of the common fund. *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050. With either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000). Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433.

## II.    Evaluation of the Fees Requested

Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"). An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing*, 444 U.S. at 478. Because the Settlement applies a *pro rata* distribution formula to determine the amount paid to each Class Member, the Court finds application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). The Ninth Circuit observed:

1

2

3

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

4  *Id.* at 1302 (internal quotation marks, citation omitted). As a result, the Court must assume a fiduciary

5  role for the class members in evaluating the reasonableness of a request for fees from the common

6  fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come

7  out of the settlement fund, the district court has a fiduciary role for the class").

8      **A.    Time and labor required**

9          Class Counsel report they worked more than 700 hours on this matter through the preparation

10  of the motion for final approval. This reported amount includes up to 498.5 hours by LippSmith

11  LLP[13] and 209.6 hours by Lawyers *for* Justice. (Doc. 82-1 at 5, LippSmith Decl. ¶ 15; Doc. 82-2 at 6,

12  St. John Decl. ¶ 11.) Class Counsel have not identified any evidence that they were precluded from

13  other work because of this action. The fact that no attorney expended more than 150 hours on this

14  action—which was filed five years ago—supports a conclusion that the time and labor required did not

15  preclude other work by either LippSmith LLP or LFJ. As a result, this factor does not support the

16  requested upward departure from the benchmark.

17      **B.    Results obtained for the Class**

18          The result achieved for the class is a significant factor to be considered in making a fee award.

19  *Hensley*, 461 U.S. at 436; *see also Lealao v. Beneficial Cal., Inc.*, 82 Cal.App.4th 19, 45 (2000)

20  ("California courts often use ... the result obtained by counsel" as a relevant factor to evaluate fees,

21  including enhancing a lodestar). The Ninth Circuit observed, "It matters little that the plaintiffs'

22  counsel may have poured their blood, sweat, and tears into a case if they end up merely spinning

23  wheels on behalf of the class. What matters most is the result for the class members." *Lowery v.*

24  *Rhapsody Int'l, Inc.*, 69 F.4th 994, 997 (9th Cir. 2023). For this reason, obtaining "exceptional

25

26

27

28

---

[13] There is a small discrepancy in the total hours reported. The lodestar chart in the declaration provided by Mr. LippSmith indicates lawyers and professional staff at LippSmith LLP worked 498.5 hours when time for each individual is added. (Doc. 82-1 at 5, ¶ 15.) However, the billing records from LippSmith LLP reflect a total of 495.6 hours. (*Id.* at 52.) For purposes of calculating the lodestar below, the Court will use the information reflected in the chart.

results" for the class will support an upward departure from the benchmark fee award. *Vizcaino*, 290 F.3d at 1048; *see also Oliveria v. Language Line Servs.*, 767 F. Supp. 3d 984, 1007 (N.D. Cal. 2025) (finding an upward departure from the benchmark was appropriate based upon the "strong results achieved" by counsel for a class and collective).

Class Counsel assert they obtained "significant benefits for the Class" and "exceptional results." (Doc. 82 at 27; *id.* at 29, emphasis omitted.)  Class Counsel observe the action settled for "a Maximum Settlement Amount of $1,906,745.14 with average estimated Individual Settlement Payments of $1,996.20, and average Individual PAGA Payments of $55.19." (*Id.* at 29-30.)  Notably, as discussed above, the anticipated net amount of $1,124,908.14 is 8.4% of the calculated maximum potential recovery for the meal, rest break, overtime, and PAGA penalties.  Although the recovery to class members is positive, the recovery is not so exceptionable or remarkable to justify an upward departure from the benchmark.  *See, e.g., Monterrubio*, 291 F.R.D. at 466 (finding the result was not "exceptional" where the recovery for the class equaled "30% of Plaintiff's calculation of Defendant's maximum liability exposure"); *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 983 (E.D. Cal. 2012) (recovery of $2,000 per class member in wage and hour class action was "not so exceptional" in it of itself to "justify an increase in the 25% benchmark").  Therefore, this factor does not support the requested fee award amounting to 35% of the common fund.

### C.    Risks undertaken by counsel

The risk undertaken is an important factor in determining the fee award.  *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).  When class counsel undertake an "extremely risky" action, an upward departure from the benchmark is appropriate. *Vizcaino*, 290 F.3d at 1048.  For example, the Ninth Circuit determined an award above the benchmark was appropriate where "counsel pursued [the] case in the absence of supporting precedents," and "[t]wice plaintiffs lost in the district court — once on the merits, once on the class definition — and twice counsel succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1048.

Class Counsel assert they faced risks in this action because "to prevail, Plaintiff would be

54

required to move for class certification successfully, defeat summary judgment, and receive a favorable verdict that would withstand an appeal." (Doc. 82 at 17; *see also id.* at 28.) They also assert that "[c]ertifying a class of 551 current and former employees presents complex issues that could undermine certification at class certification and in later stages of litigation." (*Id.* at 17.) According to Class Counsel, "Contesting class certification would likely involve factual and legal arguments, including potential individualized issues that may place Class Members in conflict with each other." (*Id.*) Ultimately, Class Counsel contend the litigation risks "included procedural challenges, substantive challenges, and difficulty proving an entitlement to remedies." (*Id.* at 30.)

Importantly, Class Counsel do not identify specific legal or factual risks, or address show a particular difficulty of establishing the merits of the claims raised. (*See* Doc. 82 at 30.) It appears the risks related to the legal merits were not novel but were rather typical of those faced in wage and hour class action, including seeking class certification. The general risks support an award at the benchmark, rather than an upward departure. *See Vizcaino*, 290 F.3d at 1048; *see also Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at *7 (C.D. Cal. Dec. 5, 2019) (risks that are common to "wage-and-hour-class actions … counsel[] in favor of approving the fee award at the benchmark").

### D. Financial risk related to contingent fee

Class Counsel contend they "took a significant risk of non-payment" by taking on this action." (Doc. 82 at 87, emphasis omitted.) Class Counsel report Plaintiff entered into a "contingency-fee agreement," under which he "agreed to a contingency fee of at least 35 of the recovery." (Doc. 82-1 at 6, St. John Decl. ¶ 9.) Despite the fact that Class Counsel worked on a contingency basis, there is no evidence that Class Counsel faced atypical risks in doing so with this case. Mr. LippSmith indicates that he is "a contingency class action lawyer," and as a result it appears that a significant portion of his practice involves work that on a contingency fee basis. (Doc. 82-1 at 3, LippSmith Decl. ¶ 9.)

Notably, contingency fee agreements between class representatives and counsel "are not particularly helpful because retainer agreements do not involve, and are not binding, on the class." *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *2 (N.D. Cal. Mar. 1, 2011) (citing *Vizcaino*, 290 F.3d at 1050); *see also Ruiz v. Towne Air Freight, Inc.*, 2018 WL 5936551, at *1 (C.D. Cal. Mar. 13, 2018) (concluding that a 35% agreed-upon contingency fee did not justify an upward departure from the

benchmark in a wage-and-hour class action because it was "more a reflection of the Class Representatives' relative lack of sophistication and negotiation abilities than anything else"). Plaintiff's agreement does not bind the class members to the 35% contingency fee indicated in the agreement, and it does not assist this Court in determining whether the fees requested from the common fund are fair or reasonable.

Moreover, the Ninth Circuit has suggested the distinction between a contingency arrangement and a fixed fee arrangement may not be a relevant factor, depending on whether the Court applies the lodestar method or the common fund method. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Regardless, the risk associated with the contingent nature of the fee alone does not justify an upward departure of the benchmark. *See Correa v. Zillow, Inc.*, 2021 WL 4925394, at *6 (C.D. Cal. June 14, 2021) (standing alone, "the attorneys' contingent risk… does not justify an upward departure of the benchmark"); *Clayton v. Knight Transp.*, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (acknowledging the contingent nature was "an important factor," but declining to grant an upward departure where "the risks associated with this case are no greater than [those] associated with any other wage and hour action and no extraordinary circumstances exist that would support an increase from the 25% benchmark"); *Fan v. Delta Air Lines*, 2020 WL 5044614, at *4 (C.D. Cal. May 20, 2020) (finding a fee award of 25% of the settlement fund was appropriate where counsel proceeded on a contingency basis because "nearly all wage and hour class action litigation is conducted [in this manner]"). Because Class Counsel do not identify any unusual risk with the contingent nature of their fee in this action, this factor does not support the requested upward departure from the benchmark. *See Vizcaino*, 290 F.3d at 1048.

### E.    Complexity of issues and skill required

The complexity of issues and skills required may support a departure from the benchmark fee award. *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in awarding attorney's fees that totaled 33% settlement fund, finding a departure from the

benchmark was warranted "because of the complexity of the issues and the risks"); *see also Ayala v. Valley First Credit Union*, 2024 WL 1053820, at *7 (E.D. Cal. Mar. 11, 2024) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award" [citation omitted]).

Class Counsel assert this is a "complex case." (Doc. 82 at 29.) However, Class Counsel do not identify any specific complex legal or factual issues faced in this matter. On the other hand, the overall experience of Class Counsel undoubtedly benefited Plaintiff and Class Members. As noted, Class Counsel engaged in discovery, "engag[ed] a data analytics expert," and calculated damages in advance of the mediation sessions. (Doc. 82 at 19; *see also* Doc. 82-2 at 3-5, St. John Supp. Decl. ¶¶ 4-8.) Based upon the information provided, Class Counsel displayed skills consistent of those that would be expected of attorneys of comparable experience. The skill and experience of Class Counsel with wage and hour class action litigation very likely assisted the parties in evaluating the strengths and weaknesses of the action. Accordingly, the Court finds this factor supports an award equal to the benchmark. *See Monterrubio*, 291 F.R.D. at 458 (declining to depart from the benchmark based upon the "skill and quality of the work in [the] particular case," though acknowledging counsel were "skilled litigators in the wage and hour context").

### F.    Length of the professional relationship

The records from Mr. St. John indicate "Lawyers *for* Justice" first began working on this action in 2019. (*See* Doc. 82-2 at 42.) It appears the professional relationship between Plaintiff and Class Counsel has lasted approximately six years. The duration of the professional relationship may warrant an award below the benchmark. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### G.    Awards in other cases

Class Counsel observe, "A leading authority recognizes that '[e]mpirical studies show that . . . fee awards in class actions average around one-third of the recovery." (Doc. 82 at 30, *quoting Hershey v. ExxonMobil Oil Corp*., 2012 U.S. Dist. LEXIS 153803, *21-22 (D. Kan. Oct. 26, 2012) [citing 4 H. Newberg & A. Conte, Newberg on Class Actions, § 14:6 (4th ed. 2006)].) Class Counsel

1    acknowledge that "[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to

2    33.3 percent of the total settlement value, with 25 percent considered a benchmark percentage." (*Id.* at

3    30-31, quoting *Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 488 (E.D. Cal. 2013).) However,

4    Class Counsel contend that "[f]orty percent contingency case retainers are typical in California." (*Id.*

5    at 31, citing LippSmith Decl. ¶ 17 [Doc. 82-1 at 6].) As discussed above, however, the case retainer

6    agreement between Plaintiff and Class Counsel agreement does not assist this Court in analyzing

7    whether the fees requested are fair and reasonable.

8    　　　In the memorandum to support final approval, Class Counsel do not discuss—let alone

9    identify— any specific fee awards in other matters to support a conclusion that the upward departure

10   from the benchmark is appropriate in this matter. (*See* Doc. 82 at 31.) However, in a supplemental

11   declaration, Mr. St. John contends: "A review of comparable court-approved class action settlements

12   obtained by Class Counsel within the last three [] years, involving the same or similar types of

13   employees, claims, and/or issues … shows that the Settlement is fair, reasonable, and adequate, and in

14   the best interests of the Class." (Doc. 83 at 3, Supp. Decl. ¶ 5.) In support of this assertion, he cites the

15   class settlements in *Lewis v. ABB Optical Group, LLC*, Alameda County Superior Court, Case No.

16   RG19008874; *Harper v. DGA, Inc. dba Pro- Form Laboratories*, Solano County Superior Court, Case

17   No. FCS051001; and *Garcia v. Clinicas De Salud Del Pueblo, Inc.*, Riverside County Superior Court,

18   Case No. RIC1905175. (*Id.*) From a review of the information provided—including the total

19   settlement amounts, number of participating class members, the average recovery, and the specific

20   amount of fees awarded—it appears Class Counsel received fees in the amount of 30% of the fund in

21   *Lewis*, 35% of the fund in *Harper*, and 35% of the fund in *Garcia*. (*See id.* at 3-4.) However, Class

22   Counsel do not provide any information regarding the analysis performed by the courts to evaluate the

23   fee requests, such as the stage of the proceedings when the settlement was reached, the challenges

24   faced, such as certification, decertification, or other dispositive motions; or the hours worked. To that

25   extent, the Court is unable to find the identified fee awards support a conclusion that the fees requested

26   *here* are fair and reasonable.

27   　　　**H.    Lodestar crosscheck and market rate**

28   　　　The Court may perform a lodestar cross-check to assist in the determination of whether the fees

sought from a common fund are reasonable. *See Indirect Purchaser Class v. Erwin (In re Optical Disk Drive Prods. Antitrust Litig.)*, 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable"); *Lafitte*, 1 Cal. 5th at 504 ("[a] lodestar cross-check … provides a mechanism for bringing an objective measure of the work performed into the calculation of a reasonable attorney fee"). The lodestar is calculated with multiplying the time "reasonably expended" in the action by "a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Lafitte*, 1 Cal. 5th at 489.

Class Counsel report the lodestar totals $763,799 and contend this supports an award of fees in the amount requested of $665,000. (Doc. 82 at 25-29; Doc. 82-1 at 5, LippSmith Decl. ¶ 15 & Table 1.) However, this lodestar calculation from Class Counsel suffers serious flaws, particularly as to the inclusion of the "anticipated" time and the hourly rates applied.

### 1.    Time expended

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable. *Fischer*, 214 F.3d at 1119; *Lafitte*, 1 Cal. 5th at 489. When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *See Barbosa,* 297 F.R.D. at 451 (citation omitted). However, the Court has the discretion to review submitted time sheets to determine whether the time expended was reasonable. *See In re Washington Public Power Supply System Securities Litig.,* 19 F.3d 1291, 1298 (9th Cir. 1994) (concluding the district court acted within its discretion in reducing the lodestar for unnecessary and duplicative work); *see also Lafitte*, 1 Cal. 5th at 505 ("trial courts retain the discretion to consider detailed time sheets as part of a lodestar calculation, even when performed as a cross-check on a percentage calculation").

The Court reviewed the billing records and time charts from LippSmith LLP and Lawyers *for* Justice, which show a total of more than 700 hours on this matter. (Doc. 82-1 at 11-52; Doc. 82-2 at 22-40.) The time Class Counsel expended on the litigation involved preparation of the pleadings, challenges to jurisdiction, extensive discovery, communications with Plaintiff, interviews with putative class members, two mediation sessions, and communications with the Settlement Administrator.

1    Although there were multiple lawyers working on this matter, it does not appear that it resulted in

2    duplicative work or overbilling.  The Court finds the 498.5 hours by LippSmith LLP and 209.6 hours

3    by Lawyers *for* Justice were reasonable on this matter.[14]

4                    2.    Anticipated hours

5          The lodestar calculation from Class Counsel includes 50 hours of "future time" for work

6    following the filing of this motion.  (Doc. 82-1 at 5, ¶ 15.)  Mr. LippSmith reports this is time that

7    "Class Counsel anticipates devoting to final approval proceedings, settlement implementation, and

8    submissions of final accounting at the end of the Settlement period."  (*Id.*, ¶ 16.)  Importantly, the Court

9    vacated the final approval hearing and counsel were not required to travel to the hearing as planned.

10   (*See* Doc. 88 at 3 [explaining future costs identified by counsel included travel costs for the hearing].)

11   Class Counsel do not provide any explanation regarding how they estimated the time for settlement

12   implementation and administration.  The Court declines to speculate as to the time to be expended and

13   cannot find the amount is reasonable given the lack of evidence supporting the estimate.  Therefore, the

14   Court deducts the 50 hours of "future time" from the lodestar calculation below.  *See Freshko Produce*

15   *Servs. v. Write On Marketing*, 2019 WL 3798491 at *3 (E.D. Cal. Aug. 13, 2019) (reducing

16   "anticipated fees" from a lodestar calculation where there was "no documentation or explanation

17   regarding time that would be spent enforcing the judgment" and the "declin[ing] to speculate as to the

18   actual time that will be spent").

19                   3.    Hourly rates

20         Next, the Court must determine whether the hourly rates are reasonable to calculate the lodestar.

21   *See Florida*, 915 F.2d at 545 n.3; *see also Lafitte*, 1 Cal. 5th at 489.  The Supreme Court explained

---

23   [14] The billing records from LippSmith LLP erroneously included a limited number of clerical tasks in the billing
24   records, related to reviewing calendar deadlines, performing a conflict check, and compiling/formatting the
     timesheet data.  (*See generally* Doc. 82 at 11-52.)  Such clerical tasks generally should be omitted from the
25   lodestar calculation. *See Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("purely clerical or secretarial
     tasks should not be billed …, regardless of who performs them"); *Nadarajah v. Holder,* 569 F.3d 906, 921 (9th
26   Cir. 2009) ("time [that] was clerical in nature … should have been subsumed in firm overhead"); *see also Ede v.*
     *Comm'r of Soc. Sec.*, 2024 WL 2209680, at *3 (E.D. Cal. May 16, 2024) (indicating "reviewing calendar
27   deadlines" is a clerical task); *Acosta v. Perez*, 2021 WL 3910543, at *13 (E.D. Cal. Sept. 1, 2021) (identifying a
     conflict check as clerical work).  However, because the total time reported by the firm is nearly 500 hours, the
28   Court declines to recalculate the lodestar to deduct the minimal clerical entries from the total for purposes of the
     cross-check.

attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984). In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Thus, when a case is filed in the Eastern District of California, this District "is the appropriate forum to establish the lodestar hourly rate…" *See Jadwin v. County of Kern*, 767 F. Supp. 2d 1069, 1129 (E.D. Cal. 2011).

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11. The applicant meets this burden by producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community … are satisfactory evidence of the prevailing market rate"); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) (courts must identify the "prevailing hourly rate" for the community). However, "rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). Plaintiff neither argues nor presents evidence that local counsel was unavailable to litigate his claims in this action. Thus, the Court must determine whether the hourly rates requested by counsel are reasonable for the Fresno Division of the Eastern District.

### a.    Rates for counsel

To calculate their lodestar, LippSmith LLP applied the hourly rates of $950 for partners with 16.2 years of experience and $1,200 for the co-founders of LippSmith LLP, who each had 22.2 years of experience practicing law. (Doc. 82-1 at 5, ¶ 5 and Table 1.) Lawyers *for* Justice applied hourly rates ranging from $575 for a senior attorney to $1,495 for a managing attorney/ shareholder. (Doc. 82-2 at 7, ¶ 12.) Mr. LippSmith asserts:

> I believe the rates set forth in Table 1 represent reasonable contingency
> fee rates for each Timekeeper that this Court should use to evaluate

> whether the Attorney Fees provided in this Settlement are fair and reasonable. The contingency hourly rates for the Timekeepers are generally higher than prevailing billable hourly rates because "[l]awyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, irrespective of whether they win or lose." *Blum v. Stenson*, 465 U.S. 886, 903 (1984).

(Doc. 82-1 at 6, ¶ 17.)  Mr. St. John asserts that the hourly rates for LFJ "are the reasonable and usual hourly rates for the referenced attorneys' services in wage and hour class action cases handled by Lawyers *for* Justice, PC, and are commensurate with rates charged in the community by other plaintiffs-side and defense-side attorneys in this practice area."  (Doc. 82-2 at 7, ¶ 13.)  Notably, however, Class Counsel are located in the Central District and appear to refer to that community. They do not present any evidence that the Eastern District previously approved of these hourly rates or provide any evidence from other attorneys from *this* forum regarding the hourly rates awarded to lawyers of comparable experience.  *See Chaudhry*, 751 F.3d at 1110-11.

The Court performed a comprehensive survey of attorney fees awarded in the Eastern District and finds hourly rates generally range from $200 to $750, with hourly rates exceeding $600 reserved for attorneys who have been practicing approximately 30 years.  *See, e.g., Terry v. Wasatch Advantage Grp., LLC*, 2025 WL 406589, at *5 (E.D. Cal. Feb. 2, 2025) (evaluating hourly rates requested in a class action, and observing the Eastern District has "awarded fees based on hourly rates between $600 and $700 per hour for attorneys with thirty years' experience or more who represent clients in class actions and complex civil cases"); *Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly rates ranging from $650 through $750" for "attorneys with over thirty years of experience" for purposes of calculating a lodestar)  For this reason, the rates applied by LippSmith LLP and LFJ to calculate the lodestar exceed those typically awarded in the local forum for lawyers of comparable experience.  *See Terry*, 2025 WL 406589, at *5; *see also Schmidt v. Vision Serv. Plan*, 2025 WL 708535, at *11 (E.D. Cal. Mar. 3, 2025) (reviewing hourly rates in a wage-and-hour class action and finding the request rates for partner attorneys of $1,155 to $1,295 and associate rates of $685 to $985 were "significantly higher than those previously accepted by this Court as reasonable").  Accordingly, the hourly rates for counsel must be adjusted to those of the local forum.

Recently, this Court determined that "[a]ttorneys with less than ten years' experience usually are awarded fees based on hourly rates between $200 and $400." *Terry*, 2025 WL 406589, at *5; *see also Siafarikas v. Mercedez- Benz USA, LLC*, 2022 WL 16926265, at *3 (E.D. Cal. Nov. 10, 2022) (approving the hourly rate of $250 for an attorney "who has practiced law for three years"); *Am. Multi-Cinema, Inc. v. Manteca Lifestyle Ctr., LLC*, 2024 WL 1312209, at *3 (E.D. Cal. Mar. 26, 2024) (reducing the requested hourly rates to $375 for associate attorneys). With these parameters in mind, the rate for Tara Zabehi, who has been in practice for 8 years, is adjusted to $400; and the rate for Brittany Shaw, who has been in practice for 5 years, is adjusted to $350. The hourly rates for Brian St. John and Elizabeth M.R-H Parker-Fawley—senior attorneys with LFJ, who have been practicing for about 10 years—are adjusted to $425.

For attorneys with approximately 12-19 years of experience, the Court has awarded rates of approximately $450-500 per hour. *See, e.g., Diaz v. United Parcel Service, Inc.*, 2023 WL 8622325, at *17 (E.D. Cal. Dec. 12, 2023) (applying a $450 hourly rate for a partner with 14 years of experience, for purposes of calculating the lodestar in a wage-and-hour class action); *Olguin v. FCA US LLC*, 2024 WL 4012103, at *7 (E.D. Cal. Aug. 30, 2024) (reviewing fees awarded in this district and awarding the hourly of $450 to attorney practicing for approximately 13 years); *see also Terry*, 2025 WL 406589, at *5. Both Randolph Greenwald, a former attorney with LFJ, and Arby Aiwazian, currently with LFJ, had approximately 14.7 years of experience while working on this matter. (Doc. 82-1 at 5, ¶ 5.) Celene Chan Andrews and Jaclyn L. Anderson, lawyers with LippSmith LLP, each report 16.2 years of experience through working on this action. (*Id.*) Based upon their reported experience, for purposes of calculating the lodestar, the hourly rates for Randolph Greenwald and Arby Aiwazian are adjusted to $450; and the hourly rates of Celene Chan Andrews and Jaclyn Andreson are adjusted to $475.

Finally, rates of approximately $500 or more are reserved for attorneys who have 20 years or more in practice. *See, e.g., Terry*, 2025 WL 406589, at *5 (observing that in this district, hourly rates for class action and complex civil litigation lawyers may range from $500 to $600 per hour "for attorneys with multiple decades' experience"); *see also Siafarikas v. Mercedez- Benz USA, LLC*, 2022 WL 16926265, at *3 (E.D. Cal. Nov. 10, 2022) (approving the hourly rate of $500 for an attorney who had practiced law for 21 years); *Garybo v. Leonardo Bros*, 2021 WL 449350, at *5 (E.D. Cal. Sept. 30,

1   2021) (adopting the recommended hourly rate of $500 for attorneys in a wage-and-hour class action

2   who were admitted to practice for 20 years or more).  Graham LippSmith and MaryBeth LippSmith

3   each report they were admitted to practice in 2002, and Edwin Aiwazian was admitted to practice in

4   2004.  (Doc. 82-1 at 5, ¶ 5.)  Based upon the information provided regarding their years of

5   experience—as well as acknowledging their status as co-founders of LippSmith LLP and the managing

6   attorney at LFJ, respectively—the Court finds an adjusted hourly rate of $575 is appropriate for

7   Graham LippSmith, MaryBeth LippSmith, and Edwin Aiwazian.

8   *b.    Rate for non-attorney staff*

9   To calculate their lodestar, Class Counsel applied the hourly rate of $300 for Niki B. Smith, a

10  paralegal who performed work on this action.  (Doc. 55-6 at 2.)  However, this amount exceeds the

11  hourly rates for even the most experienced paralegals in the Eastern District.

12  Paralegal rates within the Eastern District range from $100 to approximately $200 per hour,

13  depending on both education and experience.  *See, e.g., Terry*, 2025 WL 406589, at *5 (approving a

14  $200 hourly rate as reasonable for a paralegal who held a master's degree in statistics and had more

15  than 20 years of experience); *Bernal v. Sacramento Cty. Sheriff Dep't*, 2023 WL 2504895, at *5 (E.D.

16  Cal. Mar. 14, 2023) (rates of "approximately $100 per hour" were reasonable for paralegals in this

17  district); *Gilbert v. Jabar Wireless Inc.*, 2023 WL 3055108, at *9 (E.D. Cal. Apr. 24, 2023) (finding

18  the hourly rate of $115 was reasonable for "experienced paralegals"); *Block v. Narwal*, 2022 WL

19  17455502, at *9 (E.D. Cal. Dec. 6, 2022) (finding the requested rate of $115 was reasonable for

20  paralegals who had more than ten years of experience).  Class Counsel report that Niki Smith has 16

21  years of experience as an assistant and 11 years as a paralegal.  (Doc. 82-1 at 5, ¶ 5.)  Based upon her

22  significant experience, the Court finds the rate of $150 is reasonable.

23  3.    Calculation and cross-check

24  Based upon the survey of fees awarded in the Eastern District and the Court's own knowledge,

25  the adjusted rates are reasonable and align with prevailing local market rates.  *See Terry*, 2025 WL

26  406589, at *5; *Garybo*, 2021 WL 449350, at *5; *see also Ingram v. Oroudjian,* 647 F.3d 925, 928 (9th

27  Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its

28  own knowledge and experience" to determine reasonable hourly rates).  With the rate adjustment and

1   deduction of future time, set forth above, the lodestar totals **$325,467.50**:

| Legal Professional | Hours | Rate | Lodestar |
|---|---|---|---|
| *LippSmith LLP* | | | |
| Graham B. LippSmith | 141.3 | $575 | $81,247.50 |
| MaryBeth LippSmith | 106.3 | $575 | $61,122.50 |
| Celene Chan Andrews | 141.3 | $475 | $67,117.50 |
| Jaclyn L. Anderson | 34.0 | $475 | $16,150.00 |
| Niki B. Smith | 75.6 | $150 | $11,340.00 |
| *Lawyers for Justice PC* | | | |
| Edwin Aiwazian | 43.2 | $575 | $24,840.00 |
| Arby Aiwazian | 13.9 | $450 | $6,255.00 |
| Elizabeth M. R-H Parker Fawley | 4.9 | $425 | $2,082.50 |
| Brian St. John | 27.1 | $425 | $11,517.50 |
| Tara Zahebi | 0.8 | $400 | $320.00 |
| Brittany Shaw | 84.4 | $350 | $29,540.00 |
| Randolph Greenwald | 3.2 | $450 | $1,440.00 |
| Jeffrey D. Klein | 29.4 | $425 | $12,495.00 |
| *Future time* | 0 | n/a | n/a |
| **Total** | | | **$325,467.50** |

Thus, the fees requested exceed the lodestar by more than $300,000.00, and the lodestar cross-check does not support the fees in the amount requested by Class Counsel. Rather, the cross-check would support a downward departure from the benchmark.

**III.     Amount of Fees to be Awarded**

As discussed above, the time and labor required, the risks undertaken—which are common to wage-and-hour class actions, and the results obtained support an award at the benchmark of 25% from the common fund. Although the length of the professional relationship and lodestar cross-check support a downward departure, the Court finds these factors are outweighed by the remaining factors identified by the courts to evaluate the reasonableness of a fee request. *See Kerr*, 526 F.2d at 70; *see also Laffitte*, 1 Cal.5th at 489. Accordingly, the Court awards fees at the benchmark of 25% of the common fund of $1,906,745.14, or a total of **$475,000.00**.[15] This modified amount is fair, adequate, and reasonable as required under Rule 23.

///

---

[15] The Court considers the common fund to be $1,900,000.00, because the parties agreed that the additional $6,745.14 is specifically designated to payments for the Omitted Class Members. (*See* Doc. 76 at 5)

# REQUESTS FOR COSTS

## I.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted).  Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Costs may also be awarded under California law to an individual who prevails on a PAGA claim.  *See* Cal. Lab. Code § 2699(g).

The Settlement provides that Class Counsel may seek "reasonable litigation costs and expenses up to $23,000."  (Doc. 70-2 at 7.)  In the pending motion, Class Counsel originally requested litigation expenses in the amount of $21,597.01.  (Doc. 82 at 10, 26; Doc. 82-1 at 8, ¶ 20.)  Reviewing the evidence submitted, the Court observed this amount included future costs.  (Doc. 87, citing Doc. 82-1 at 8, ¶ 20.)  The Court ordered Class Counsel to file supplementary evidence regarding the litigation expenses— including an itemization of costs— and noted that "the Court will not award costs for *anticipated* costs, but rather actual litigation expenses that were incurred." (*Id.* at 1, emphasis in original.)  In response, Class Counsel provided itemization of costs from LippSmith LLP and LFJ. (Doc. 88-1 at 3; Doc. 88-2 at 5.)  Class Counsel also indicate they "do not seek reimbursement of any anticipated costs," which related to travel associated with the final approval hearing vacated by the Court.[16] (Doc. 88 at 3.)  Accordingly, Class Counsel request litigation expenses in the amount of $20,897.01. (*Id.* at 4.)

The advanced costs identified by Class Counsel total $18,276.77 from LippSmith LLP and $2,620.24 from LFJ, for a total of $20,897.01.  (Doc. 88-1 at 3; Doc. 82-2 at 5, 42.)  The advanced costs include fees for filing, two mediation sessions, and mailing.  (Doc. 82-2 at 42; Doc. 88-1 at 3.)  Previously, this Court observed that costs "including filing fees, mediator fees, ground transportation, copy charges, computer research, and database expert fees … are routinely reimbursed" in class action

---

[16] Class Counsel's request for an award of future expenses in the amount of $700.00 is deemed **WITHDRAWN**. (Doc. 88 at 3.)

1    cases.  *Alvarado v. Nederend*, 2011 WL 1883188 at \*10 (E.D. Cal. Jan. May 17, 2011); *see also*

2    *Ontiveros*, 303 F.R.D. at 375 (finding costs including mediation, mileage, court fees, research, and

3    expert fees were "reasonable litigation fees" and approving class counsel's request for costs).  Because

4    the costs requested are reasonable and the type routinely approved in wage-and-hour class action

5    settlements, the request for litigation expenses is **GRANTED** in the amount of **$20,897.01.**

6    **II.    Costs of Settlement Administration**

7         The Court appointed Simpluris, Inc., to serve as the Settlement Administrator.  (Doc. 73 at 42.)

8    Eric Springer, the Director of Client Services for Simpluris, acknowledged that the responsibilities of

9    the company for settlement administration of this action include:

10                (a) establishing and maintaining a fund for Class Members; (b) calculating
             all amounts due to each Class Member pursuant to the Settlement; (c)
11           processing checks and mailing payments to Class Members; (d) preparing,
             processing, and filing all applicable tax forms and tax returns; (e)
12           establishing and maintaining a calendar of administrative deadlines and
             responsibilities; (f) printing and mailing by First-Class Mail the Notice of
13           Pendency of a Class Action Settlement ("Notice of Settlement") to Class
             Members in English; (g) conducting a National Change of Address
14           ("NCOA") database search prior to mailing the Notice of Settlement to
             Class Members and performing a skip-trace on any Notice of Settlement
15           returned as Undeliverable; (h) receiving and validating written requests to
             be excluded from the Settlement ("Requests for Exclusion"), written
16           objections to the Settlement, and disputes regarding the number of
             workweeks or pay periods that a Class Member worked for Defendant; (i)
17           providing weekly reports to counsel; and (j) performing any other tasks
             necessary to carry out its responsibilities as set forth in the Settlement, as
18           the Parties mutually agree, or as the Court orders Simpluris to perform.

19    (Doc. 70-5 at 3, Springer Decl. ¶ 8; *see also* Doc. 70-2 at 9-10, ¶ 1.31.)  For these tasks, Simpluris

20    determined the "project has a fixed frate of $8,837.00."  (*Id.* at 4, ¶ 13.)  Accordingly, the Settlement

21    provides that settlement administration costs "are not to exceed $9,000.00," and the Court preliminarily

22    authorized costs up to $9,000.00.  (Doc. 70-2 at 9, ¶ 1.31; Doc. 73 at 43.)

23         After the parties identified the two Omitted Class Members, the Settlement Administrator

24    "advised the Parties that the total Settlement Administration Costs, including additional costs

25    associated with administering the Settlement with respect to the Omitted Class Members, will not

26    exceed the amount allocated in the Preliminary Approval Order."  (Doc. 76 at 5, ¶ N.)  As a result, no

27    additional costs would result from the additional service of the Class Notice.  (*Id.*)  Plaintiff now

28    requests a payment of $8,837.00 to the Settlement Administrator.  (*See* Doc. 82 at 13; Doc. 82-5 at 4.)

Based upon the information provided regarding the tasks performed by the Settlement Administrator—and the continuing responsibilities with the calculation of the shares of the Settlement Class and PAGA Aggrieved Employees, issuance and mailing of those settlement payments, and any necessary tax reporting on such payments—the Court finds the requested Settlement Administration costs are reasonable.  Thus, a payment of $**8,837.00** for the Settlement Administrator from the gross fund is **APPROVED**.

## CONCLUSION AND ORDER

Based upon the foregoing, the Court finds the "Joint Stipulation of Class Action and PAGA Settlement" is fair, adequate, and reasonable.  The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the settlement agreement.  Thus, the Court **ORDERS**:

1. Plaintiff's request for certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

   > All current and former hourly-paid or non-exempt employees who worked for any of the Defendants within the State of California at any time during the period from September 15, 2016, through April 11, 2024, and who reside in California.

2. Final approval of the Settlement Agreement—with the modifications to ¶¶ 4.5.6, 4.6.7, 4.6.9, 4.9 and 4.11.4, as identified in the Court's order dated October 23, 2024 (Doc. 73) — is **GRANTED**.

3. The PAGA award in the amount of $**100,000.00** from the Maximum Settlement Amount, including payment of $75,000.00 to California's Labor and Workforce Development Agency and $25,000.00 to aggrieved employees, is **APPROVED**.

4. The request for a class representative service payment for Plaintiff is **GRANTED** in the modified amount of $**5,000.00**.

5. Class Counsel's motion for fees is **GRANTED** in the modified amount of 25 percent of the common fund, which totals $**475,000.00**.

6. Class Counsel's request for litigation costs and expenses is **GRANTED** in the amount of $**20,897.01**.

///

7.   Settlement Administration costs in the amount of $**8,837.00**, to be paid from the Maximum Settlement Amount, are **APPROVED**.

8.   The Court **DECLINES** to appoint Legal Aid at Work as the cy pres beneficiary, without prejudice to renewal of the request following disbursement of the settlement shares to Class Members and Aggrieved Employees.

9.   The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

10.   The Clerk of Court is **DIRECTED** to close this action.

11.   The Court retains jurisdiction to consider all further applications arising from or related to the Settlement Agreement.

IT IS SO ORDERED.

Dated:   **September 20, 2025**

UNITED STATES DISTRICT JUDGE

69